United States Court of Appeals
Fifth Circuit

**F I L E D**

September 17, 2004

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 03-41059

_____

VIRGIL EURISTI MARTINEZ,

Petitioner - Appellant,

versus

DOUG DRETKE,
Director, Texas Department of Criminal Justice,
Correctional Institutions Division,

Respondent - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Texas, Galveston
District Court Cause No. 02-CV-718

_____

Before HIGGINBOTHAM, DAVIS and PRADO, Circuit Judges.[1]

PER CURIAM.

Petitioner Virgil Euristi Martinez was convicted of capital murder in Texas state court and sentenced to death. After exhausting his state remedies, Martinez applied for federal habeas relief. The district court denied Martinez's application for a writ of habeas corpus, but it granted Martinez a certificate of appealability for his ineffective assistance of counsel claim. After considering that claim on appeal, this

---

[1]Pursuant to 5TH CIRCUIT RULE 47.5, this court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIRCUIT RULE 47.5.4.

1

court vacates the portion of the district court's judgment that rejects Martinez's ineffective assistance of counsel claim and remands the case for development of the record on that claim.

## Background for this Appeal

A jury convicted Martinez of murdering his ex-girlfriend, Veronica Fuentes; Veronica's two children, five-year-old Joshua and three-year-old Cassandra; and bystander John Gomez. During the sentencing portion of Martinez's trial, the State of Texas presented the testimony of several witnesses to establish Martinez's future dangerousness. Martinez's lawyers, however, called only one witness, Dr. Anand Mehendale. Dr. Mehendale, a neurologist from Kerrville State Hospital, testified that Martinez's EEG indicated an epileptic focus in the right temporal lobe of Martinez's brain and that epilepsy can cause amnesia during a seizure. Dr. Mehendale indicated that a person having a seizure cannot engage in planned activity. After hearing this evidence, the jury determined a probability existed that Martinez would commit criminal acts of violence that would constitute a continuing threat to society and that insufficient mitigating circumstances existed to warrant a sentence of life imprisonment rather than death.[2] Accordingly, the state trial court entered a judgment sentencing Martinez to death by lethal injection.

---

[2] *See* TEX. CODE CRIM. PROC. ANN. art. 37.071, § 2 (Vernon Supp. 2004) (setting forth issues that jury must consider during punishment phase of capital case in Texas).

During his state habeas proceeding, Martinez argued that his trial attorneys were ineffective because they did not fully investigate his epilepsy as a mitigating factor. Martinez contended that evidence of his condition "would have rebutted the State's case of future dangerousness, provided the jury with a vehicle to spare his life, both in terms of future dangerousness and mitigation, and provided an explanation for [his] behavior and violent crime." Without conducting a hearing, the state habeas judge determined that the attorneys' performance did not fall below an objective standard of reasonableness. After reviewing the record and the habeas judge's findings, the Texas Court of Criminal Appeals denied Martinez's application for habeas relief.

Considering the same claim, the district court agreed that trial counsel's performance during the punishment phase of Martinez's trial did not fall below professional norms and denied Martinez's application for federal habeas relief. Although not explicitly stated in its order, the district court implicitly determined the state court's disposition of the claim was not an unreasonable application of clearly established federal law. The district court did not conduct a hearing.

## Standard of Review

In a habeas corpus appeal, this court reviews the district court's findings of fact for clear error and its conclusions of

3

law de novo, applying the same standards to the state court's decision as did the district court.[3]  This court may not grant relief on a claim that a state court has adjudicated on the merits "unless the adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."[4]  "A state court's decision is deemed 'contrary to' clearly established federal law if it relies on legal rules that directly conflict with prior holdings of the Supreme Court or if it reaches a different conclusion than the Supreme Court on materially indistinguishable facts."[5]  "A state court's decision constitutes an unreasonable application of clearly established federal law if it is objectively unreasonable."[6]  This court presumes the state court's findings of fact are correct, and the petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence.[7]

### Martinez's Ineffective Assistance of Counsel Claim

On appeal, Martinez maintains that the decisions of the

---

[3]See *Busby v. Drekte*, 359 F.3d 708, 713 (5th Cir. 2004).

[4]28 U.S.C. § 2254(d)(1).

[5]*Busby*, 359 F.3d at 713 (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)).

[6]*Pondexter v. Dretke*, 346 F.3d 142, 146 (5th Cir. 2003).

[7]*See* 28 U.S.C. § 2254(e)(1).

state habeas court and the district court were unreasonable applications of *Strickland v. Washington*[8] because the decisions assumed that the strategy of defense counsel was reasonable even though that strategy was based on unreasonably inadequate investigation. Martinez contends that his trial attorneys were ineffective during the punishment phase of his trial because they failed to investigate his disease, temporal lobe epilepsy. Martinez maintains that if his attorneys had investigated the nature of temporal lobe epilepsy, they would have learned about its impact on aggression and violence. According to Martinez, a reasonable probability exists that at least one juror would have considered the disease as a mitigating circumstance warranting a sentence of life imprisonment rather than death. Martinez contends that his lawyers simply gave up on the punishment phase of trial without considering the impact of his disease.

To establish ineffective assistance of counsel under *Strickland*, a criminal defendant must show that his attorney's assistance was deficient and that the deficiency prejudiced him.[9] "To establish deficient performance, a petitioner must demonstrate that counsel's representation 'fell below an

---

[8]*Strickland v. Washington*, 466 U.S. 668 (1984).

[9]*See Hopkins v. Cockrell*, 325 F.3d 579, 586 (5th Cir.), *cert. denied*, 124 S. Ct. 430 (2003).

5

objective standard of reasonableness.'"[10]  This court's primary concern in deciding whether defense counsel exercised reasonable professional judgment is not whether counsel should have presented a mitigation case, but rather whether the investigation supporting counsel's decision not to introduce mitigating evidence of the defendant's background was itself reasonable.[11] "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."[12]  After applying these principles to Martinez's claim, this court concludes that the record is not sufficiently developed regarding the adequacy of the investigation into Martinez's epilepsy to resolve Martinez's claim.

To support his complaint that his attorneys did not fully investigate his condition, Martinez relies, in part, on an affidavit by Dr. Theodore Pearlman which Martinez first presented to the state habeas judge.  One of Martinez's trial attorneys, Jeri Yenne, sought Dr. Pearlman's assistance in determining Martinez's competency to stand trial, the viability of an insanity defense, and Martinez's potential for future

---

[10]*See Wiggins v. Smith*, 123 S. Ct. 2527, 2535 (2003)(quoting *Strickland*).

[11]*See Wiggins,* 123 S. Ct. at 2536.

[12]*Strickland*, 466 U.S. at 690.

6

dangerousness. In his affidavit, Dr. Pearlman attests that "never have I been presented with such tangible evidence supporting a diagnosis of Epilepsy related to criminal behavior." Dr. Pearlman explained that if he had testified during the punishment phase of Martinez's trial, he would have explained that:

> individuals with [temporal lobe epilepsy], even individuals who seem to behave seemingly deliberately, are pathologically driven by seizure activity occurring in the brain.... An attack of [temporal lobe epilepsy] does not necessarily cause total lack of consciousness. There might be a narrowing of full awareness during an attack, impairing the ability to think and act normally. While an episode of [temporal lobe epilepsy] is not exclusive of some degree of willful behavior, [temporal lobe epilepsy] diminishes capacity for full responsibility.

This information could be important mitigation evidence because it suggests that Martinez may have acted with diminished capacity and could have provided the jury with an explanation for why he committed his crime. The record, however, does not confirm how much of this information Yenne learned in her investigation.

Although Martinez's habeas attorney stated in the state habeas application that Dr. Pearlman reported to Yenne that Martinez suffered from temporal lobe epilepsy, Dr. Pearlman's report is not part of the record. Instead of indicating that Dr. Pearlman reported that Martinez suffers from temporal lobe epilepsy, Yenne's notes state that: Dr. Pearlman found that Martinez was competent to stand trial, but insane at the time of the murders; Dr. Pearlman explained that the outreach center had

7

been correct in its initial finding that Martinez did not use drugs; Dr. Pearlman believed that Kerrville Hospital misdiagnosed Martinez and gave him a medication which aggravated his seizures; and Dr. Pearlman opined that future dangerousness was highly unlikely. But Yenne's notes do not include Dr. Pearlman's diagnosis. Thus, it is impossible to confirm whether Dr. Pearlman advised Yenne that Martinez suffers from temporal lobe epilepsy or whether Dr. Pearlman's report should have triggered further investigation.

Martinez also relies on a habeas affidavit by Dr. Mehendale, the neurologist who testified during the punishment phase of trial. Martinez presented the affidavit to the state habeas judge. Although his trial testimony did not address this aspect of Martinez's epilepsy, Dr. Mehendale attested in his affidavit that:

> while [Martinez] may not have been experiencing a seizure while he was allegedly committing acts of murder, [temporal lobe epilepsy] definitely played a role in [Martinez's] aggression. Patients with [temporal lobe epilepsy] are odd, bizarre patients and there are significant intercital abnormalities of a psychiatric nature in these patients. If [Martinez] had been diagnosed and treated as epileptic while he was still a child, [Martinez] would have had stable brain functioning. This would have reduced his chances of progressive personality deterioration that can occasionally occur in patients with [temporal lobe epilepsy]. With proper diagnosis and management..., [Martinez's] propensity for committing acts of murder would be somewhat diminished.

This information could be important mitigation evidence because it suggests that Martinez suffers from personality deterioration

8

and may not have committed his crime if he had been treated as a child. It also suggests that Martinez might not commit future acts of violence if he received treatment. But as with Dr. Pearlman's affidavit, the record does not confirm how much of this information Yenne learned in her investigation.

Instead of indicating that Dr. Mehendale believed temporal lobe epilepsy caused Martinez to act aggressively, Yenne's interview notes reflect that Dr. Mehendale advised her that an EEG indicated Martinez suffered from a seizure disorder and that Martinez's drug test did not indicate drug use. Yenne's notes, however, do not indicate whether Dr. Mehendale told her that Martinez suffered from temporal lobe epilepsy or about its potential for causing aggressive behavior. Although it is clear that Yenne knew Martinez suffered from some type of seizure disorder, it is impossible to determine whether Dr. Mehendale told Yenne that Martinez suffers from temporal lobe epilepsy or about its effect on aggressive behavior.

Martinez further relies on his educational records. These records reflect that Martinez experienced learning difficulties in school that may have resulted from mental problems, that Martinez had average intelligence, and that he was often disruptive in class. This information could be important mitigation evidence because it supports Dr. Pearlman's assessment of an impaired ability to act normally and Dr. Mehendale's description of a progressive personality disorder. Yenne's

9

notes, however, do not indicate whether she read the school records and considered how Martinez's behavioral problems might be related to what she learned from Dr. Pearlman and Dr. Mehendale, or whether she simply forwarded the records to Dr. Pearlman for evaluation. Because the record reflects only that Yenne obtained the records and forwarded them to Dr. Pearlman, it is impossible to determine whether Yenne investigated how the records might serve as mitigation evidence.

Martinez also relies on the affidavits that his trial attorneys submitted to the state habeas judge. The state habeas judge instructed the attorneys to file affidavits that responded to Martinez's allegation that they "[f]ailed to recognize Complex Partial Seizure Disorder and/or Temporal Lobe Epilepsy as a mitigating factor." Despite this specific instruction, Yenne explained little in her affidavit. In regard to mitigation, Yenne explained that she and co-counsel, Stan McGee, concluded that "if we forwarded any information concerning other good acts performed by the defendant or character [sic] this would open the door to other witnesses as to his bad character and it was not worth the same." Yenne did not address whether she learned that Martinez suffers from temporal lobe epilepsy or whether she considered using Martinez's epilepsy as mitigation evidence during the punishment phase of trial.

McGee's affidavit is somewhat more detailed, but nevertheless unhelpful. McGee attested that:

10

> it appeared to me that we were pursuing a defense of mistaken identity, among others, that [Martinez's] statements to the court appointed experts may have been admissible as a result of the introduction of evidence concerning issues of learning problems, mental disabilities, and a claim of mitigation. As to a failure to develop a defense to the State's arguments for future dangerousness, I cannot say that we did not do that.

Notably, McGee does not indicate what he and Yenne knew about Martinez's epilepsy or whether they considered the condition as mitigating evidence. As a result, it is impossible to ascertain whether the attorneys investigated Martinez's epilepsy condition.

Without having some indication of what Yenne and McGee knew about Martinez's condition, and what they did to investigate the condition, the district court lacked the evidence needed to determine whether the investigation supporting the decision not to use evidence of Martinez's condition during the punishment phase of trial was reasonable,[13] or whether the decision not to investigate further was reasonable.[14] To make those determinations, the district court needed evidence that is beyond the present record. Where the petitioner's allegations cannot be resolved without examining evidence beyond the record, the district court should conduct a hearing.[15] An evidentiary hearing is required where a state habeas petitioner did not

---

[13]*See Wiggins,* 123 S. Ct. at 2536.

[14]*Strickland*, 466 U.S. at 690.

[15]*See Byrne v. Butler*, 845 F.2d 501, 512 (5th Cir. 1988).

11

receive a state court hearing and alleges facts which, if proved, would entitle him to relief, and the record reveals a genuine factual dispute as to the alleged facts.[16]

In his application for federal habeas relief, Martinez alleged that Dr. Pearlman's report "brimmed with mitigating information," but that "[t]here is no evidence in the attorney's files that the mitigating evidence provided by [Dr.] Pearlman was recognized by either trial attorney." Martinez further asserted that although testimony was available from both Dr. Pearlman and Dr. Mehendale that he suffered from temporal lobe epilepsy, and that both doctors agreed that temporal lobe epilepsy caused some of his aggression, his attorneys failed to recognize, develop and introduce the mitigating evidence these doctors offered. These allegations, if proved, would entitle Martinez to relief because it would have given the jury an explanation for Martinez's crime. In addition, the record reveals a genuine factual dispute as to the allegations – that is, did Martinez's attorneys know about his condition; if so, what did they do to investigate the nature of his condition and to develop it as mitigating evidence?

The district court should have conducted an evidentiary hearing to determine whether Martinez's attorneys undertook any strategic calculation or informed balancing about presenting temporal lobe epilepsy as mitigating evidence. Because the

_____

[16]*See Murphy v. Johnson*, 205 F.3d 809, 815 (5th Cir. 2000); *see also Townsend v. Sain*, 372 U.S. 293, 312-13 (1963).

12

district court did not conduct a hearing, this court VACATES that portion of the district court's judgment that addresses Martinez's ineffective assistance of counsel claim based on the failure of his attorneys to investigate temporal lobe epilepsy as mitigating evidence, and REMANDS the case to the district court with instructions to conduct an evidentiary hearing on that issue.  Following the hearing, the district court should consider whether counsel's investigation of Martinez's temporal lobe epilepsy was unreasonably deficient and, if so, whether counsel's failure to investigate this condition and produce evidence relating to it amounted to ineffective assistance of counsel. VACATED and REMANDED.