IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 23, 2008

Charles R. Fulbruge III
Clerk

No. 03-20401

ROY GENE SMITH,

Petitioner-Appellant,

v.

NATHANIEL QUARTERMAN, Director, Texas Department of Criminal
Justice, Correctional Institutions Division,

Respondent-Appellee.

———————

Appeal from the United States District Court
for the Southern District of Texas

———————

Before SMITH, DeMOSS, and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

This appeal arises from the district court's denial of Roy Gene Smith's petition for a writ of habeas corpus. A Texas jury convicted and sentenced Smith to death for the capital murder of James Whitmire. We granted Smith a certificate of appealability ("COA") on two issues: (1) whether trial counsel provided ineffective representation; and (2) whether the jury instructions given at the sentencing phase of his trial violated his constitutional rights pursuant to Penry v. Johnson, 532 U.S. 782 (2001). Based on the following reasons, we affirm the district court's judgment and deny habeas relief.

I. FACTUAL AND PROCEDURAL BACKGROUND

On October 8, 1988, Smith and Mary Williams spent the day smoking crack cocaine at a boarding house. Around 8:00 p.m., Smith and Williams left the house. While walking down the street, they came upon 67-year-old James Whitmire. Smith approached Whitmire and asked for a job. Whitmire responded that he had no available work and then turned away. Smith unzipped his jacket, drew a .22 caliber pistol, and shot Whitmire several times. Williams fled the scene. After murdering Whitmire, Smith searched his pockets and stole $4.27. As Smith rifled through Whitmire's clothing, two men approached and asked what he was doing. The men fled when Smith began shooting in their direction. Smith later reunited with Williams, and they purchased hot dogs with the stolen money. The couple spent the night in an abandoned house.

The next day, Williams returned home and contacted the police. The police searched for Smith and, after a chase, placed him under arrest. Smith subsequently signed a written statement that the district court quoted as follows:

> Last night I approached a guy and robbed him. When I [sic] pull my pistol he hollered "I'm not giving up my money." I already had it cocked. I just kept firing. Afterwards I reached into his left back pocket and took his wallet, and his front pocket had $4.27 in it. The wallet had no money.

> The gun I used was a .22 revolver, I don't know the make. The guy that got shot was an old guy, I'd say about 54 or 55. After I shot him I ran all the way back to Mills Court. I hid in an abandoned house, and stayed there until daybreak. About 3:00 to 3:15 this afternoon, I went to the park. I had the gun in a brown paper bag. The next thing I knew was that you all arrived. I rolled over the hill and peeped up, and saw that you all were coming up. I panicked and ran. I ran to this old abandoned garage and threw the pistol down in the yard, by the garage. I climbed up in the garage, and hid, and that is when the officer opened the door. This is the God honest truth.

Smith v. Cockrell, No. H-00-1771, slip op. at 2-3 (S.D. Tex. filed March 31, 2003). Smith also confessed that during the week prior to the homicide, he committed another capital murder, another shooting, and several robberies.

After a jury trial, Smith was convicted of capital murder in the 208th Judicial Court of Harris County, Texas, Judge Benjamin A. Martinez presiding. The district court summarized the evidence adduced at the punishment phase of trial as follows:

> During the punishment phase of trial, the State elicited testimony concerning Smith's extensive criminal history. The State also introduced evidence relating to Smith's week-long crime spree before Whitmire's homicide, including his confession to several crimes. Additionally, the State introduced testimony of violent threats by Smith in prison and his poor parole history.
>
> At the punishment phase, the defense presented testimony from Smith's sister, Carolyn Smith, who described the crime-ridden environment her brother lived in [Smith grew up in an area in Houston, Texas known as "Fifth Ward"] and testified that she had never known her brother to use crack cocaine. She also described her brother as calm and not violent. Smith's mother, Wilbert Lee Smith, testified on his behalf. She testified that her son never used crack cocaine or carried a gun. She also described her son's childhood and the crime-infested neighborhood in which she lived, commented on his good behavior in the penitentiary, and pleaded for mercy. A Harris County Sheriff's Deputy, Thomas Gentry, testified that Smith had no major trouble while previously incarcerated. Finally, Smith took the stand himself and explained that he had been on a drug binge at the time of the homicide and did not remember killing Whitmire. Smith also expressed remorse for the killing.

Id. at 3-4.

Following the admission of this evidence, the state trial court instructed the jury to answer one of three special issues in the negative if the mitigation

evidence sufficiently required a life sentence. On May 11, 1990, the jury affirmatively answered all three special issues, and the trial court sentenced Smith to death by lethal injection.

On February 24, 1993, the Texas Court of Criminal Appeals ("TCCA") affirmed his conviction and sentence in an unpublished opinion. State of Texas v. Roy Gene Smith, Cause No. 71,099 (Tex. Cr. App. 1993). The TCCA also denied rehearing. On November 15, 1993, the United States Supreme Court denied Smith's petition for writ of certiorari. Smith v. Texas, 510 U.S. 979 (1993). On April 18, 1997, Smith timely filed an application for writ of habeas corpus in state district court. The state habeas court declined to hold an evidentiary hearing on his claims and adopted the State's findings of fact and conclusions of law. Based on these findings and conclusions, the TCCA denied habeas relief. Ex parte Roy Gene Smith, No. 42,801-01 (Tex. Cr. App. 1999).

Smith successfully sought the appointment of new counsel for his federal court proceedings. On May 29, 2000, Smith timely filed his federal petition for writ of habeas corpus. The State filed an Answer and Motion for Summary Judgment. On March 31, 2003, the district court granted the State's motion for summary judgment and dismissed the petition in an unpublished opinion. Smith v. Cockrell, CA No. H-00-1771 (S.D. Tex. March 31, 2003). The district court also denied sua sponte Smith's COA request. On September 22, 2003, Smith timely requested a COA from this court. After a thorough analysis, we concluded that reasonable jurists could debate whether the district court erred in denying Smith's ineffective assistance of counsel claim and his Penry claim. On August 17, 2005, we granted a COA for those two claims, the merits of which are now before this court on appeal. Smith v. Dretke, 422 F.3d 269 (5th Cir. 2005). Accordingly, pursuant to 28 U.S.C. §§ 2253 & 2254, Smith appeals two issues: (1) whether his death sentence violated the Sixth and Fourteenth

4

Amendments because Smith received ineffective assistance of counsel; and (2) whether the trial court's nullification instruction to the jury violated the Eighth and Fourteenth Amendments in light of Penry v. Johnson, 532 U.S. 782 (2001).

II. STANDARD OF REVIEW

Smith filed his habeas petition in district court on May 29, 2000, after the effective date of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). We therefore review his appeal pursuant to AEDPA. See 28 U.S.C. § 2253; Lindh v. Murphy, 521 U.S. 320, 336 (1997). AEDPA provides in relevant part that:

> an application for a writ of habeas corpus shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Morrow v. Dretke, 367 F.3d 309, 313 (5th Cir. 2004) (citing 28 U.S.C. § 2254(d)).

A state court unreasonably applies established law when it "reaches a legal conclusion in direct opposition to a prior decision of the United States Supreme Court or when it reaches a different conclusion than the United States Supreme Court on a set of materially indistinguishable facts." Riddle v. Cockrell, 288 F.3d 713, 716 (5th Cir. 2002). Absent such a direct conflict with Supreme Court authority, habeas relief is only available if a state court decision is unreasonable. Montoya v. Johnson, 226 F.3d 399, 404 (5th Cir. 2000). A state court unreasonably applies established federal law when it correctly identifies the governing precedent but unreasonably applies it to the facts of a particular case. Morrow, 367 F.3d at 313. A state court's incorrect application of clearly

established Supreme Court precedent is not enough to warrant federal habeas relief. Williams v. Taylor, 529 U.S. 362, 410-12 (2000). Thus, federal habeas relief may only occur when the state court makes both an incorrect and objectively unreasonable application of the governing law. Morrow, 367 F.3d at 313. State court findings of fact are presumed correct unless the defendant rebuts this presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## III. DISCUSSION

### A. Ineffective Assistance of Counsel

Smith argues that his trial counsel provided ineffective assistance at the punishment phase because they failed to sufficiently investigate his background. This in turn affected their ability to implement the appropriate trial strategy. Smith asserts that his attorneys overlooked pertinent evidence, including testimony relating to his pre-adolescence, the psycho-pharmacological implications of his prolonged substance abuse and intoxication at the time of the offense, and his ability to control his behavior during a previous period of incarceration.

The State argues that Smith's ineffective assistance of counsel claim is procedurally defaulted for failure to exhaust his claim in state court. According to the State, Smith's affidavits fundamentally alter the claim raised in state court, and the federal petition contains allegations not alluded to in his state claim. If not procedurally defaulted, the State maintains that the ineffective assistance claim fails because trial counsel made tactically reasonable decisions in conducting their investigation into Smith's background and presenting mitigation evidence. The State further argues that Smith suffered no prejudice because the government adduced compelling evidence at trial to overcome this burden.

6

1. Procedural Default

This court reviews de novo whether a federal habeas petitioner exhausted all available state court remedies. Morris v. Dretke, 413 F.3d 484, 491 (5th Cir. 2005). Under § 2254(b)(1), a defendant must exhaust all claims in state court prior to requesting federal collateral relief. Beazley v. Johnson, 242 F.3d 248, 263 (5th Cir. 2001). "The exhaustion requirement is satisfied when the substance of the federal habeas claim has been fairly presented to the highest [state] court." Morris v. Dretke, 379 F.3d 199, 204 (5th Cir. 2004) (citing Mercadel v. Cain, 179 F.3d 271, 275 (5th Cir. 1999)). Generally, federal courts dismiss habeas petitions asserting claims not exhausted in state court. See 28 U.S.C. § 2254(b)(1)(A); Rose v. Lundy, 455 U.S. 509, 519-20 (1982).

We conduct a fact and case specific exhaustion inquiry to determine whether additional evidence fundamentally alters or merely supplements the state petition. Morris, 379 F.3d at 205 (citing Anderson v. Johnson, 338 F.3d 382, 386, 388 n.24 (5th Cir. 2003)). A petitioner fulfills the exhaustion requirement if "all crucial factual allegations were before the state courts at the time they ruled on the merits" of the habeas petition. Dowthitt v. Johnson, 230 F.3d 733, 746 (5th Cir. 2000). This court may also consider affidavits presented for the first time in federal habeas proceedings. The affidavit cannot present new factual allegations and must supplement as opposed to fundamentally alter claims presented to the state court. Morris, 379 F.3d at 204-05; Dowthitt, 230 F.3d at 746. If the petitioner presents material evidentiary support for the first time in federal court, then he has not exhausted his state remedies. Morris, 379 F.3d at 204-05.

In the state habeas petition, Smith argues that trial counsel denied him effective assistance of counsel during the punishment phase because they "failed to adequately investigate [his] history, when such historical information was

essential in the preparation of a biopsychosocial assessment by an expert in the area of mitigation, thereby denying applicant the opportunity to present mitigating evidence during punishment." Smith asserts that the biopsychosocial life history outline or evaluation would "detect the presence of significant factors such as neurological impairment; cognitive disabilities; physical, sexual or psychological abuse; substance abuse; mental disorders; or other factors which influence the development of Applicant's personality and behavior." Smith also urged that a social history investigation would have explained his developmental history and the links between his history and his conduct at the time of the offense.

In response to Smith's argument, the state habeas court found "based on the credible affidavits" of trial counsel that: (1) "applicant's trial counsel believed that the applicant's relatives were much more persuasive in bringing out the influence of historical and environmental factors on the commission of the crimes than an expert witness would have been;" (2) "both trial counsel were firm in their belief, based upon a thorough investigation of the records as well as their personal interaction with the applicant, that the applicant was a mentally sound and coherent individual;" and (3) "trial counsel withdrew their motion for a psychiatric expert and refused to use a mitigation specialist as a matter of trial strategy." Based on these findings, the state habeas court concluded that trial counsel was "not ineffective for failing to request an independent psychiatric evaluation or to use a mitigation expert" and "the totality of the representation provided by trial counsel to the applicant was well within an objective standard of reasonableness."

On federal habeas review, Smith focuses his ineffective assistance of counsel claim on trial counsel's failure to investigate the following: (1) his history of drug addiction and his cocaine and alcohol intoxication at the time of the

crime; (2) his family background; and (3) his disciplinary records from previous periods of incarceration. To support his claim, Smith introduces affidavits from his mother, family members not contacted during the trial investigation, Dr. Paula Lundberg-Love, and the investigator retained by his federal habeas attorney. Roy Smith's mother, Wilbert Smith, testified at his trial, but her affidavit discusses the alleged lack of preparation for her testimony. Smith's family members not contacted by trial counsel submitted affidavits regarding his troubled childhood. Dr. Lundberg-Love attested to the physical and mental affects of prolonged substance abuse. The district court concluded that Smith's claims are procedurally barred because the state habeas court interpreted his ineffective counsel claim as limited to trial counsel's failure to conduct a biopsychosocial assessment and hire a mitigation expert. We agree with the district court's legal conclusion.

In his state habeas petition, Smith cites to relevant precedent requiring trial counsel to conduct an adequate legal and factual investigation. Smith then acknowledges the two family members called to testify on his behalf during the punishment phase. Smith concludes this portion of his brief with an argument that "trial counsel's conduct in failing to investigate Applicant's life history denied Applicant the ability to have a mitigation specialist provide the jurors with a cohesive picture of the life that Applicant lived . . . . Trial Counsel's conduct was deficient, in that Trial Counsel deprived Applicant of having the jury consider all of the individualized circumstances required in deciding whether Applicant deserved to live or die." (emphasis added) The state habeas court specifically ruled on trial counsel's decision not to conduct a professional psychiatric evaluation and to elicit testimony from a mitigation expert. In his federal petition, however, Smith now argues that trial counsel should have investigated a possible temporary insanity defense, sought prison records

suggesting a nonviolent disposition during incarceration, and interviewed Smith's relatives with the intent that they testify in the punishment phase. The two petitions assert similar arguments only to the extent that both raise an issue of ineffective assistance of counsel. Smith's federal habeas petition argues that trial counsel denied him the constitutional right to effective counsel based on an alleged failure to investigate his background and drug use. The substance of Smith's ineffective assistance claim brought in state court, however, alleges that a biopsychosocial evaluation should have been utilized to facilitate the testimony of a mitigation expert during the punishment phase. In sum, Smith changed the focus of his federal claim to substantive areas not previously raised in the state courts. Therefore, Smith's claim before this court is unexhausted.

Further, Smith alleges new facts in his federal petition not considered by the state court, even assuming arguendo that Smith presented the substance of his ineffective assistance of counsel claim to the state court (in a most general sense). The affidavits submitted in these federal proceedings, regarding Smith's childhood and the effects of his substance abuse, are procedurally barred from consideration because the statements constitute "material additional evidentiary support [presented] to the federal court that was not presented to the state court." Dowthitt, 230 F.3d at 745-46. The exhaustion of state remedies, codified in § 2254(b)(1), requires a petitioner to provide the highest court of the state a fair opportunity to apply the controlling federal constitutional principles to the same factual allegations before a federal court may review any alleged errors. Duncan v. Henry, 513 U.S. 364, 365-66 (1995). In this case, Smith failed to allow the TCCA an opportunity to review the credibility of his family's affidavits presented to this court regarding trial counsel's investigation and Smith's abusive childhood. "The exhaustion requirement is not satisfied . . . where the petitioner presents new legal theories or factual claims in his federal habeas

petition. Neville v. Dretke, 423 F.3d 474, 478 (5th Cir. 2005) (citing Bagwell v. Dretke, 372 F.3d 748, 755 (5th Cir. 2004)). Smith's attempt to submit new evidence threatens the state's right "to pass upon and correct alleged violations of its prisoners federal rights . . . ." Summers v. Dretke, 431 F.3d 861, 880 (5th Cir. 2005) (quoting Picard v. Connor, 404 U.S. 270, 275 (1971)). Accordingly, Smith's ineffective assistance of counsel claim is procedurally barred.

Smith relies on two cases from the Fifth Circuit to support the argument that he exhausted his claims. In Dowthitt and Anderson v. Johnson, 338 F.3d 382 (5th Cir. 2003), this court concluded that affidavits not presented in state court did not allege "new facts" and thus, the federal habeas court was not procedurally barred from considering the statements. In Dowthitt, however, petitioner presented an affidavit to the state habeas court from his state habeas investigator that detailed interviews with petitioner's family. 230 F.3d at 748. Accordingly, this court concluded that the family member affidavits presented in the federal habeas proceedings presented no new facts. Id. Here, Smith's state habeas application contains no evidence of child abuse other than the petitioner's allegations. In Anderson, the petitioner filed a pro se state habeas petition. In his application to the state court, the petitioner identified a potential witness and detailed the proposed testimony of this witness. The court described Anderson's state habeas petition as "remarkably detailed in both fact and law." Anderson, 338 F.3d at 388. In light of Anderson's identification of a specific witness and the detailed description of the witness's anticipated testimony, this court determined that petitioner's submission of an affidavit from the witness in the federal habeas proceedings merely supplemented the record to the state court. Id. Smith provided no such details for the state court to consider on habeas review. For these reasons, Dowthitt and Anderson provide no support for Smith's exhaustion argument.

11

To the contrary, Smith's case more aligns with Kunkle v. Dretke, 352 F.3d 980, 986-90 (5th Cir. 2003), wherein this court found that the petitioner failed to exhaust his state court remedies. During the state habeas proceedings, Kunkle presented one affidavit from trial counsel averring that abundant mitigating evidence existed regarding petitioner's background. On federal habeas review, Kunkle presented evidentiary support in the form of a detailed psychological report and an affidavit from his mother describing the mental illness of herself and Kunkle's father and specific instances of child abuse. Id. at 988. This court held that the report and affidavit were significant additional facts not presented to the state court, and Kunkle's claim would have been substantially different in state court with this additional information. Id. at 988. Therefore, Kunkle's claims were procedurally barred. Similarly, Smith's affidavits from his family and the mitigation expert may not be considered on federal habeas review because these statements present material facts that fundamentally alter his claim.

To overcome the procedural bar, Smith must demonstrate cause for his default and actual prejudice or "show that the failure to consider his claims will result in a fundamental miscarriage of justice." Elizalde v. Dretke, 362 F.3d 323, 329 (quoting Beazley, 242 F.3d at 264). A showing of cause requires that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule," such as "the factual or legal basis for a claim was not reasonably available to counsel, or that some interference by officials made compliance impracticable." Murray v. Carrier, 477 U.S. 478, 488 (1986). As for prejudice, the petition must show "not merely that the errors . . . created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." Id. at 493 (internal quotations omitted). In his briefing to this court, Smith fails

to fully address the exhaustion argument and thus, he fails to demonstrate cause and prejudice. Accordingly, we find that Smith is procedurally barred from receiving a determination on the merits of his ineffective assistance of counsel claim.

2. On the Merits

Although Smith neglected to exhaust his ineffective assistance claim, we are satisfied that this claim would also be denied on the merits. As a mixed question of law and fact, we review de novo the district court's resolution of Smith's ineffective assistance of counsel claims. Ladd v. Cockrell, 311 F.3d 349, 357 (5th Cir. 2002) (citing Crane v. Johnson, 178 F.3d 309, 312 (5th Cir.), cert. denied, 528 U.S. 947 (1999)). The well-settled principles in Strickland v. Washington, 466 U.S. 668 (1984), govern the merits of ineffective assistance of counsel claims. Therefore, since the rule of law was clearly established at the time of the state court conviction, Smith's arguments regarding trial counsel's performance meet the threshold requirement under AEDPA, § 2254(d)(1).

Under Strickland, the petitioner must show that: (1) counsel's performance was deficient; and (2) the deficient performance prejudiced his defense. Dowthitt, 230 F.3d at 743 (citing Strickland, 466 U.S. at 687). The court applies an objective standard of reasonableness, as measured by professional norms, to determine whether counsel's performance was deficient. Id.; Ladd, 311 F.3d at 357. Prejudice occurs when "there is a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceedings would have been different." Dowthitt, 230 F.3d at 743 (citing Clark v. Johnson, 227 F.3d 273, 282-83 (5th Cir. 2000)).

Smith asserts that his attorneys should have introduced records demonstrating his good behavior during previous periods of incarceration, sought a psychiatric evaluation to determine the detrimental affects of his long-

13

term substance abuse, and interviewed more of his family members about his childhood. We address each argument in turn.

a.      Good Behavior in Institutional Setting

Smith's good behavior during previous imprisonment constitutes evidence capable of both mitigating and aggravating his punishment. While Smith's good behavior in institutional settings shows an ability to not cause problems in controlled environments, this attribute also shows his propensity to not abide by the laws of our society. See Ladd, 311 F.3d at 360 (holding that counsel's decision to not admit evidence regarding good behavior in institutional settings did not support ineffective assistance of counsel claim). Moreover, on cross-examination, the State likely would have presented Smith's three disciplinary violations while incarcerated for prior criminal convictions. Cockrum v. Johnson, 119 F.3d 297, 302 (5th Cir. 1997) (upholding trial counsel's decision to not allow witnesses with positive and negative experiences involving the defendant to testify during the punishment phase). Smith's counsel incorporated portions of this evidence, however, through the testimony of a correctional officer. Officer Gentry testified about Smith's good behavior while incarcerated in the local jail. For these reasons, we conclude that trial counsel performed reasonably in not fully disclosing Smith's prison records during the punishment phase.

b.      Psychiatric Evaluation

Smith argues that his trial counsel should have conducted psychiatric testing because his prolonged drug use caused organic brain damage. At sentencing, trial counsel theorized that Smith "was too high on coke during the offense for it to be deliberate." In that same vein, Smith testified at sentencing about his cocaine addiction, its influence upon his behavior, and his inability to remember parts of the evening the offense occurred due to his intoxication. Even

though trial counsel maintained that Smith's substance abuse affected his judgment, trial counsel did not investigate the effects of his substance abuse history on his behavior at the time of the offense. Smith filed a motion for a psychiatric expert's fee, but trial counsel withdrew the motion before starting the guilt phase of the trial.

In this appeal, Smith suggests that the mere knowledge of his prolonged substance abuse should have prompted trial counsel to evaluate his cognitive functions and test for organic brain damage. But Smith never indicated to his attorneys that prolonged substance abuse caused his behavior at the time of the crime. His affidavit proffers that his drug use in the days and hours immediately preceding the murder influenced his behavior. Both attorneys averred that Smith appeared sane and lucid throughout their preparation and counsel discovered no history of mental illness or defect despite his prior terms of incarceration in the Texas prison system. See Miniel v. Cockrell, 339 F.3d 331, 344 (5th Cir. 2003) (citing West v. Johnson, 92 F.3d 1385, 1409 n.46 (5th Cir. 1996)) (concluding that "counsel is not constitutionally ineffective for insufficiently investigating a defendant's mental or psychological condition when there is nothing to put counsel on notice that such a condition exists."). The state habeas court found the affidavits of both attorneys to be credible on this issue, and Smith fails to present clear and convincing evidence to overcome the deference owed to the state court on this particular factual finding. 28 U.S.C. § 2254(e)(1); Ramirez v. Dretke, 398 F.3d 691, 694 (5th Cir. 2005) (requiring defendant to present clear and convincing evidence that state court findings are not correct).

Moreover, Smith fails to show how counsel's failure to present psychiatric evidence prejudiced his defense. Dr. Lundberg-Love's affidavit fails to support his ineffective counsel claim because she never interviewed Smith; instead, she

based her assessment on habeas counsel's reports. See Dowthitt, 230 F.3d at 746 (holding that an affidavit from Dr. Lundberg-Love did not fulfill the petitioner's burden to demonstrate that trial counsel's decision prejudiced his defense in the punishment phase because she never performed an examination). Her evaluation lacks any conclusive determinations of whether Smith suffers from organic brain damage and cognitive impairment; therefore, we cannot conclude, based on her statement, that a psychological evaluation would have altered Smith's sentence. See Rompilla v. Beard, 545 U.S. 374 (2005) (finding that counsel provided ineffective assistance when evidence later showed that defendant actually suffered from organic brain damage, fetal alcohol syndrome, and metal retardation).

Finally, similar to Smith's good behavior evidence, a jury could mitigate his sentence based on the presumed diminished capacity of persons under the influence of illegal narcotics. The jury could also conclude that his addiction will never cease and would cause him to present an ongoing danger to society. Accordingly, Smith fails to make a "substantial showing of prejudice on this Strickland claim" because he did not establish that counsel's failure to arrange a psychiatric evaluation "undermined confidence in the outcome." Dowthwitt, 230 F.3d at 747.

c.    Childhood Background

Generally accepted standards of competence require that counsel conduct an investigation into petitioner's background. Miniel, 339 F.3d at 344. Trial counsel's failure to present mitigating evidence during the penalty phase is not per se ineffective assistance. Ransom v. Johnson, 126 F.3d 716, 723 (5th Cir. 1997). Instead, "[s]trategic choices made after a less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to

make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Wiggins v. Smith, 539 U.S. 510, 521 (2003) (quoting Strickland, 466 U.S. at 690-91).

Ronald Mock, Smith's trial counsel, stated that he interviewed many of Smith's family members and childhood acquaintances. In an affidavit submitted in state court, trial counsel provided a list of interviewees. Joyce Jones, Smith's second trial counsel, contended that in preparation for Smith's trial, they conducted an extensive investigation and "interviewed various witnesses including his family members, associates, sheriff's deputies, and his parole officer." She also maintained that they interviewed Smith on numerous occasions about his social, educational, employment, criminal, and health history. According to Mock, Wilbert and Carolyn Smith, Smith's mother and sister, were "important in order to educate the jury about the environment in which the Applicant existed and was raised." Deputy Gentry was "important to show that the Applicant could exist peacefully in a prison setting." Finally, Smith's "own testimony showed the jury that he was determined to become a better person and that he was very sorry for the crimes."

In these federal post-conviction proceedings, Smith presents affidavits from nine family members attesting to their willingness to have testified on his behalf had trial counsel requested their testimony. The question arises of whether a sufficient investigation should have included interviews with these people and whether counsel reasonably relied on Smith's sister and mother to convey the mitigating evidence contemplated in Smith's petition. The state habeas court made no factual findings specific to the investigation of Mock and Jones into Smith's family history. Moreover, Smith did not submit affidavits from his family to the state court or set forth the details of any alleged child abuse in his habeas petition. Instead, based on the affidavit of Mock and Jones,

the state habeas court found that trial counsel "believed that the applicant's relatives were much more persuasive in bringing out the influence of historical and environmental factors on the commission of the crimes than an expert witness would have been."

Hence, as stated above, even if Smith's ineffective assistance of counsel claim is not procedurally barred, our consideration of these affidavits would be impermissible because the statements offer material facts not presented in the state habeas court that fundamentally alter his claim. In other words, Smith deprived the state court of the opportunity to evaluate the credibility of these statements and whether the information contained in the affidavits could have affected Smith's sentence; therefore, we cannot consider the affidavits. See Joyner v. King, 786 F.2d 1317, 1320 (5th Cir.), cert. denied, 107 S. Ct. 653 (1986) (finding that "the policies of comity and federalism underlying the exhaustion doctrine" require that "new factual allegations in support of previously asserted legal theory" be first presented to the state court); see also Dowthitt, 230 F.3d at 748; Graham v. Johnson, 94 F.3d 958, 968 (5th Cir. 1996); Brown, 701 F.2d at 495-96. Without the affidavits, Smith's ineffective assistance of counsel claim, based on his good institutional behavior and diminished capacity due to prolonged drug use, fails to demonstrate any deficiencies in trial counsel's investigation. Accordingly, we deny habeas relief on this claim.

B. Penry Claim

Under AEDPA, we review Smith's habeas claim applying only "rule[s] of law that [were] clearly established at the time his state-court conviction became final." Williams v. Taylor, 529 U.S. 362, 390 (2000). Smith's conviction became final on November 15, 1993.

Smith argues under Penry v. Lynaugh, 492 U.S. 302 (1989) [hereinafter Penry I], that the Texas special issues and nullification instruction provided an inadequate vehicle for the jury to consider his mitigation evidence. More specifically, Smith asserts that the jurors could not give full effect to the following mitigating factors: his intoxication at the time of the offense and long-term drug addiction; his impoverished family background; and his character formation in a crime-ridden neighborhood.[1] The State contends that the special issues allowed the jurors to give full effect to Smith's evidence of substance abuse and childhood circumstances.

The jury affirmatively answered all three special issues submitted pursuant to Tex. Code Crim. Proc. art. 37.071(b), which read as follows:

(1) Was the conduct of the defendant, Roy Gene Smith, that caused the death of the deceased committed deliberately and with the reasonable expectation that the death of the deceased or another would result?

(2) Is there a probability that the defendant, Roy Gene Smith, would commit criminal acts of violence that would constitute a continuing threat to society?

(3) Was the conduct of the defendant, Roy Gene Smith, in killing the deceased unreasonable in response to the provocation, if any, by the deceased?

In response to Penry I, the state trial court instructed the jury to give effect to the mitigating evidence by submitting a negative answer to one of the three

---

[1] Although Smith's mother testified to the fact that Smith's father died in 1971 (when Smith was approximately thirteen years old), Smith's Penry argument does not focus on the loss of his father as one of the factors arguing for reduced moral culpability.

special issues if such evidence required a life sentence. The trial court instructed the jury as follows:

> You are instructed that when you deliberate on the questions posed in the special issues, you are to consider mitigating circumstances, if any, supported by the evidence presented in both phases of the trial, whether presented by the State or the defendant. A mitigating circumstance may include, but is not limited to, any aspect of the defendant's character, background, record, or circumstances of the crime which you believe could make a death sentence inappropriate in this case. If you find that there are any mitigating circumstances in this case, you must decide how much weight they deserve, and thereafter, give effect and consideration to them in assessing the defendant's personal culpability at the time you answer the special issue. If you determine, when giving effect to the mitigating evidence, if any, that a life sentence, as reflected by a negative finding to the issue under consideration, rather than a death sentence, is an appropriate response to the personal culpability of the defendant, then a negative finding should be given to that special issue under consideration.

This supplemental instruction resembles the nullification instruction later denounced in Penry v. Johnson, 532 U.S. 782, 789-90 (2001) [hereinafter Penry II], which relied on Penry I, 532 U.S. at 797-98. We must determine whether under federal law it was clearly established at the time Smith's conviction became final that the type of mitigating evidence presented at his trial warrants Penry relief.

Smith offered four categories of mitigating evidence: poverty; drug addiction and intoxication; character evidence;[2] and growing up in the crime-ridden neighborhood of the Fifth Ward of Houston. At trial, Smith testified that he used drugs twenty-four hours a day nearly every day of the week and

---

[2] In his petition before the district court, Smith asserted a Penry violation with respect to his evidence of good character as well. Smith v. Cockrell, No. 00-CV-1771 (S.D. Tex. Mar. 31, 2003). He does not, however, appeal that claim here.

that the drugs must have put him in the mind set to commit capital murder. He also testified that his other crimes committed during this period were influenced by drinking heavily and smoking narcotics. Smith's mother testified about the premature death of Smith's father, her struggle to support a household of fourteen family members, and the high-crime neighborhood of Smith's youth. Smith's sister also testified about the rampant crime in the neighborhood, relating one incident in 1988 when she and Smith were held up in the street and she was forced to remove her clothes.

The TCCA concluded that the special issues did not preclude the jury from giving full effect to Smith's mitigating evidence "of living in poverty with fourteen other individuals." The TCCA's written opinion did not address the remaining categories of mitigating evidence. Relying on Fuller v. State, 829 S.W.2d 191 (Tex. Crim. App. 1992), the TCCA concluded that the nullification charge given at the punishment phase was sufficient to overcome the constitutional infirmity of Penry I and therefore, the special issues were not unconstitutional in this case. The state habeas court denied Smith's petition on similar grounds, holding that Smith's intoxication at the time of the crime, his character evidence, and his childhood in a high-crime neighborhood could be fully considered within the scope of the special issues submitted to the jury at the punishment stage.

The district court denied habeas relief as well. The district court applied the Fifth Circuit's now abrogated two-step analysis, which required the court to determine "(1) that the proffered evidence was constitutionally relevant mitigating evidence, and if so, (2) that the proffered evidence was beyond the 'effective reach' of the jurors." Madden v. Collins, 18 F.3d 304, 308 (5th Cir. 1994). Following the district court's judgment, the Supreme Court decided Tennard v. Dretke, 542 U.S. 274 (2004), which altered our Circuit's analysis of mitigating evidence in capital murder cases. Tennard

held that the constitutional relevance test had no basis in Supreme Court precedent, 542 U.S. at 286-87, and overruled the requirement that a petitioner's mitigating evidence must demonstrate "uniquely severe permanent handicaps with which the defendant was burdened through no fault of his own." See Graham v. Collins, 950 F.2d 1009, 1029 (5th Cir. 1992) (en banc), aff'd, 506 U.S. 461 (1993). The district court's conclusions were based on a now-discredited doctrine; therefore, we must examine the merits of Smith's Penry claim under clearly established federal law at the time his conviction became final as determined by the Supreme Court. 28 U.S.C. § 2254(d).

Recently, the Supreme Court decided two companion cases originating from the Fifth Circuit that guide our analysis on the application of Penry I to a petitioner's mitigating evidence.[3] See Abdul-Kabir v. Quarterman, 127 S. Ct. 1654 (2007); Brewer v. Quarterman, 127 S. Ct. 1706 (2007). In Abdul-Kabir, the petitioner[4] presented two types of mitigating evidence: (1) testimony from his mother and aunt describing a troubled childhood; and (2) two expert witnesses who discussed the consequences of Cole's childhood neglect and abandonment. 127 S. Ct. at 1660-61. Cole argued that the Texas special issues prevented the jury from considering and giving full effect to his mitigating evidence. The Court reiterated its Penry rule: "Special

---

[3] The Fifth Circuit sitting en banc also recently decided Nelson v. Quarterman, 472 F.3d 287 (5th Cir. 2006), cert. denied, 127 S. Ct. 2974 (2007). The court held that the Texas special issues as applied to the petitioner's mitigating evidence did not allow the jury to give full consideration and effect to evidence regarding his borderline personality disorder and abandonment by his mother. Additionally, this court recently decided Coble v. Quarterman, 496 F.3d 430 (5th Cir. 2007), in which this Circuit incorporates Abdul-Kabir and Brewer into the Penry analysis for the first time.

[4] The petitioner in Abdul-Kabir is referred to by his former name, Ted Cole, for clarity. 127 S. Ct. at 1659 n.1. We adopt the same convention.

instructions are necessary when the jury could not otherwise give meaningful effect to a defendant's mitigating evidence." Id. at 1668 n.14.

In Brewer, the petitioner presented mitigating evidence "that he had a bout with depression three months before the murder; that he was briefly hospitalized for that depression; that his co-defendant, a woman, with whom he was apparently obsessed, dominated and manipulated him; that he had been abused by his father; that he had witnessed his father abuse his mother; and that he had abused drugs." 127 S. Ct. at 1710 (quoting Brewer v. Dretke, 442 F.3d 273, 275 (5th Cir. 2006) (per curiam) (footnotes omitted)). On this evidence, the Court reversed the Fifth Circuit because the "jury must be allowed not only to consider such evidence, or to have such evidence before it, but to respond to it in a reasoned, moral manner and to weigh such evidence in its calculus of deciding whether a defendant is truly deserving of death." Id. at 1714. With these cases in mind, we turn to consideration of Smith's claims.

1.      Voluntary Intoxication and Drug Addiction

At the punishment phase, Smith and trial counsel reiterated the defense theory that Smith would not have committed the capital murder "but for" his intake of alcohol and crack cocaine. Of significance with respect to this category of evidence, in addition to the supplemental nullification charge, the trial court further instructed the jury regarding the definition of "deliberately" as used in the special issues. The court instructed the jury that:

> As used in the first special issue, the word "deliberately" has a meaning different and distinct from the word "intentionally" as that word was previously defined in the charge on guilt.
>
> The word "deliberately" as used in the first special issue means a manner of doing an act characterized by or resulting from careful

consideration: "A conscious decision involving a thought process which embraces more than mere will to engage in the conduct."

While the Supreme Court has not explicitly considered evidence of intoxication or long-term addiction, the Court has determined that the Texas sentencing scheme is not invalid on its face; some, if not most, mitigating evidence is properly considered within the scope of the special issues. Jurek v. Texas, 428 U.S. 262, 276 (1976). The touchstone of the Court's Penry jurisprudence is that jurors be able to give meaningful effect to all a capital defendant's mitigating evidence in the penalty phase. Abdul-Kabir, 127 S. Ct. at 1668 n.14; Brewer, 127 S. Ct. at 1710, 1712-13. In light of the evidence and deliberateness instruction, the jury could have determined that Smith's drug and substance abuse hindered his ability to make a "conscious decision" to commit capital murder, which requires more than "mere will." If the jury came to this conclusion, the jurors could have then answered the deliberateness special issue in the negative. Moreover, with regards to the future dangerousness special issue, the jury could have reasonably assumed that Smith would not have access to drugs in prison and possibly, that he would also receive rehabilitative services while incarcerated for his criminal behavior. As a result, Smith's proclivities toward violent, dangerous behavior in the future would lessen after overcoming his addiction to alcohol and crack cocaine. Accordingly, the jury was able to give full effect and express their reasoned moral response to Smith's evidence of voluntary intoxication through the special issues.

Additionally, Smith argues that the jury should have been able to mitigate his sentence merely because he was addicted to drugs and therefore morally less culpable than another person. However, Smith does not cite, nor did independent research uncover, any case where the Supreme Court

considered drug addiction as a mitigating factor that reduces a criminal defendant's moral culpability outside its relevance to the special issues, nor does Smith articulate how the mere fact that he was a self-confessed drug addict reduces his moral culpability. Instead, Smith seems to be asking for an instruction that would allow a jury "to dispense mercy on the basis of a sympathetic response to the defendant." Johnson v. Texas, 509 U.S. 350, 371 (1993). The Court rejected this idea and even noted that such a rule might render capital sentencing arbitrary. Id. at 371-72. Therefore, we affirm the district court's denial of habeas relief on this claim.

2. Troubled Childhood

Smith's evidence regarding his childhood presents a more difficult question of law. Smith presented evidence at the mitigation phase to support his argument that he lived in poverty in a crime-ridden neighborhood. At the time he committed the crime, Smith lived at his mother's house with thirteen other people. Both his mother and his sister testified that their neighborhood was home to open prostitution, drug sales, and robberies. In order to evaluate this claim, an in-depth review of the record is required. Therefore, we excerpt relevant portions of the testimony at the punishment phase.

<u>Carolyn Smith, the defendant's younger sister</u>

\* \* \* \* \*

Q: And let's talk about the community in which you live. Okay?
A: Okay.
Q: How long have you lived in the Fifth Ward, Texas?
A: I've lived in the Fifth Ward, Texas [sic] every since 1975.
Q: And in the area of town in which you live, can you tell me whether you've had an opportunity to see prostitutes in or about that community?
A: Yes, I have.
Q: Have you had an opportunity to see prostitutes on few or many occasions?
A: On many.

Q:    Have you had an opportunity to see drugs being sold in that community?

A:    Yes, I have.

Q:    On few or many occasions?

A:    Many occasions.

Q:    Have you had an opportunity to see crimes such as robberies in the community in which you live?

A:    Yes, I have.

Q:    Is it on few or many occasions?

A:    Many.

Q:    The persons, both victims and perpetrators, are they people with whom you and your family are acquainted?

A:    Yes, it is.

Q:    So the crime and situation out there in Fifth Ward, where you grew up [sic] is an everyday occurrence, isn't it?

A:    Yes, it is.

\* \* \* \* \*

Q:    You also stated with regard to Counsel's questions that in the neighborhood that you live and in the neighborhood that the defendant lived in before having been arrested, [sic] is a neighborhood where crime is an everyday occurrence, isn't that correct?

A:    Yes.

Q:    Is it your testimony to the jury that that's okay?

A:    Well, I guess so, it happens every day.

\* \* \* \* \*

(On Redirect Examination)

Q:    Now let's talk in terms about where you live.  Let's talk about what you've seen out there where you live?

A:    Uh-hum.

Q:    Have you had an opportunity to see people who use crack cocaine on few or many occasions?

A:    Many occasions

Wilbert Smith, the defendant's mother

\* \* \* \* \*

Q:    Back in October of 1988, Ms. Smith, where did you live?

A:    2112 Jensen.

Q:    And was that a house or an apartment?

A:   That's a house.
Q:   How many bedrooms were in that house?
A:   That [sic] was three.
Q:   Approximately how many people were living in that house at the time, in October of 1988?
A:   Excuse me, let me count them.  About 14.
                    *****
Q:   And the house on Jensen [sic] drive was in fact in Fifth Ward?
A:   Yes.
                    *****
Q:   Is it an areas that is known to have prostitutes walking up and down the street?
A:   Yes, it is.
Q:   Is it an area known where there is crack cocaine and drugs sold up and down the street?
A:   Yes, it is.
Q:   Is it an area where it is a high crime area?  Are police visible in that area?
A:   Yes.
Q:   And did you have the money or could you have afforded to move out of that neighborhood if you wanted to?
A:   No, I couldn't.
Q:   If you had, would you have moved?
A:   Yes, I would have.
                    *****
(On Cross-Examination)
Q:   You said you would have moved from this area in the Fifth Ward. That's a real bad area, isn't it?
A:   Yes, it is.
Q:   You don't like it begin like that, do you?
A:   No, sir.
Q:   An that Fifth Ward area is like that because people rob and steal and break into houses, isn't it?
A:   Yes.
                    *****
(On Redirect Examination)
Q:   Ms. Smith, where you live, you can't change that, can you?
A:   No.


In order to grant relief on Smith's Penry claim, we must first determine whether his mitigating evidence satisfies the "low threshold for relevance"

27

articulated in Tennard v. Dretke, 542 U.S. 274, 285 (2004).[5] Smith's evidence is clearly relevant mitigating evidence within the scope of Tennard, as even the State admits. Next, we examine whether Smith's evidence of poverty and exposure to crime fit within the special issues as mitigating evidence. Brewer, 127 S. Ct. at 1714 (citing Penry I, 492 U.S. at 322). While the State argues that Smith's evidence of his background fits within the special issues, we disagree. The State mischaracterizes Smith's use of his background at the mitigation phase. Smith's argument is not that his evidence either mitigates against his deliberateness in committing the crime or makes him less of a future danger. Instead, he argues that he is less morally culpable than someone from a more advantaged background. Unlike his argument about drug addiction, Smith's disadvantaged and/or troubled background evidence is clearly within the Court's cognizance of factors relevant to moral culpability. Penry I, 492 U.S. at 319.

However, our inquiry does not end here. If it did, any criminal defendant would be entitled to Penry relief merely by claiming that his mitigating evidence went to his moral culpability for the crime, rather than to his deliberateness or future dangerousness. This test would lead to absurd results, which the Supreme Court counseled against in Skipper v. South Carolina, 476 U.S. 1 (1986). In Skipper, the Supreme Court recognized that some evidence, such as how often the defendant will shower while in prison, is irrelevant to the sentencing scheme. Id. at 7 n.2. While this case does not involve evidence that is irrelevant to the sentencing scheme, Skipper stands for the proposition that there are logical limits to the evidence that the Supreme Court's jurisprudence in this area can accommodate.

---

[5] "The meaning of relevance is no different in the context of mitigating evidence introduced in a capital sentencing proceeding than in any other context, and thus the general evidentiary standard—any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence—applies." Tennard, 542 U.S. at 284.

In elaborating on the boundaries of mitigating evidence falling beyond the scope of the special issues, the Court has explained that:

> Nowhere in our Penry line of cases have we suggested that the question whether mitigating evidence could have been adequately considered by the jury is a matter purely of quantity, degree, or immutability. Rather, we have focused on whether such evidence has mitigating relevance to the special issues and the extent to which it may diminish a defendant's moral culpability for the crime. The transient quality of such mitigating evidence may make it more likely to fall in part within the ambit of the special issues; however, as we explained in Penry I, such evidence may still have "relevance to the defendant's moral culpability beyond the scope of the special verdict questions."

Brewer, 127 S. Ct. at 1712-13 (citing Penry I, 492 U.S. at 322). "[S]pecial instruction is not required when mitigating evidence has only a tenuous connection—'some arguable relevance'—to the defendant's moral culpability." Abdul-Kabir, 127 S. Ct. at 1668 n.14. We must therefore examine "the extent to which [Smith's background] may diminish [his] culpability for the crime." Brewer, 127 S. Ct. at 1713. We make this judgment not by looking at the "quality, degree, or immutability" of Smith's evidence, id., but by examining Supreme Court precedent and the record in this case.

Against the landscape of prior Supreme Court cases that consider this issue, Smith's evidence has only a tenuous connection to any attempt to diminish Smith's moral culpability for his crime. In Penry I, the petitioner presented the following evidence:

> Penry's sister testified that their mother had frequently beaten him over the head with a belt when he was a child. Penry was also routinely locked in his room without access to a toilet for long periods of time. As a youngster, Penry was in and out of a number of state schools and hospitals, until his father removed him from state schools altogether when he was 12. Penry's aunt subsequently struggled for over a year to teach Penry how to print his name.

29

Id. at 309 (internal citations omitted). Smith v. Texas, 543 U.S. 37 (2004), considered evidence of a childhood spent with a drug-addicted father, who regularly stole from his family members and was involved in gang violence. Id. at 41. The Brewer Court reiterated the TCCA's fact findings that:

> Appellant came from an abused background where he was ignored by both his father and step-father. He did not have a relationship or live with his real father until after he was fifteen-years old. Appellant's father hit him on several occasions, once with the butt of a pistol and once with a flashlight. Appellant's father frequently beat his mother. Appellant's father had once told him, 'If you ever draw your hand back, you'd better kill me because I'll kill you.'

127 S. Ct. at 1710 n.1. In Abdul-Kabir, the Court described Cole's evidence of a troubled childhood as follows:

> After Cole's father left [when Cole was five years old], his mother found herself unable to care for Cole and his sister and took the children to live with her parents in Oklahoma. Cole's grandparents were both alcoholics—Cole's mother was herself a self-described "drunk"—and lived miles away from other children. Eventually, because Cole's grandparents did not want their daughter or her children living with them, Cole's mother placed him in a church-run children's home, although she kept her daughter with her. Over the next five years Cole's mother visited him only twice. Cole's aunt, who visited him on holidays, testified that Cole seemed incapable of expressing any emotion and that his father never visited him at all.

127 S. Ct. at 1660-61. See also Eddings v. Oklahoma, 455 U.S. 104, 107 (1982) (noting that defendant's "parents were divorced when he was 5 years old, and until he was 14 Eddings lived with his [alcoholic and possibly working-as-a-prostitute] mother without rules or supervision" and that Eddings was later physically abused by his father); Hitchcock v. Dugger, 481

U.S. 393, 397 (1987) (presenting, but not explicitly considering, evidence that Hitchcock was "one of seven children in a poor family that earned its living by picking cotton [and] that his father died of cancer").

Smith presented evidence at the mitigation phase to support his argument that he lived in poverty in a crime-ridden neighborhood. Additionally, Smith points to his history as a victim of crime as central in the formation of his character. However, the only example of victimization he presents occurred in 1988, when Smith was at least twenty-nine years old. It is hard to reconcile this event with Smith's presentation of it as formative. Besides this evidence, Smith presented no other mitigating evidence to support his claims that his childhood circumstances would lead a jury to find that he was less morally culpable for his crime.

The types of experiences that Smith presents, in contrast to the ones in prior Supreme Court cases, are not "particularized childhood experiences of abuse and neglect." See Abdul-Kabir, 127 S. Ct. at 1673. The emphasis of the Penry cases is on childhood adversity which has a formative, adverse effect on the defendant's character, thereby potentially reducing his moral culpability. See Franklin v. Lynaugh, 487 U.S. 164, 185 (1988) (O'Connor, J., concurring) ("If, however, petitioner had introduced mitigating evidence . . . that had relevance to the defendant's moral culpability beyond the scope of the special verdict questions, the jury instructions would have provided the jury with no vehicle for expressing its "reasoned moral response" to that evidence." (emphasis added)). None of Smith's witnesses claim any such effect; indeed, to the limited extent that they mentioned his character, Smith's mother and sister described him in positive terms, as calm and respectful, and, to their knowledge, non-violent and not a drug-user. This is a case where the petitioner's evidence "has only a tenuous connection . . . to the [petitioner's] moral culpability." Abdul-Kabir, 127 S. Ct. at 1668 n.14. We emphasize that

our holding here is a narrow one, based on our detailed review of the record which contains no evidence of a connection between the poverty and crime of the Fifth Ward and Smith's character. Unless we are to assume that every individual who grew up in poverty and in a crime-infested neighborhood has, by that fact alone, potentially reduced moral culpability, requiring a Penry instruction, we cannot conclude that the TCCA erred when it decided that Smith's sentence passed muster under Penry. We do not understand the Supreme Court's precedents as compelling the conclusion that the evidence here amounts to a "particularized childhood experience of abuse and neglect" requiring us to grant Penry relief. We hold that the denial of Smith's direct appeal was not contrary to or an unreasonable application of the Supreme Court's clearly established law in this area. Accordingly, we deny his claim for habeas relief based on Penry.

## IV. CONCLUSION

For the foregoing reasons, we affirm the district court's judgment and deny petitioner's petition for writ for habeas corpus.