

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NOS. AP-75,806 & 75,807

**EX PARTE ROBERT MITCHELL JENNINGS, Applicant**

### ON APPLICATION FOR A WRIT OF HABEAS CORPUS
### IN CAUSE NO. 506814-A FROM THE
### 208TH DISTRICT COURT OF HARRIS COUNTY

PRICE, J., delivered the opinion of the Court in which MEYERS, WOMACK, KEASLER, HERVEY and COCHRAN, JJ., joined. KELLER, P.J., and JOHNSON, J., concurred in the result. HOLCOMB, J., dissented.

### O P I N I O N

In 1989, the applicant was convicted of capital murder and his punishment was assessed, in accordance with the jury's answers to the special issues at the punishment phase of trial, at death. On direct appeal, this Court affirmed his conviction and sentence in an unpublished opinion issued in 1993.[1] The applicant filed this initial application for writ of

---

[1] *Jennings v. State*, No. 70,911 (Tex. Crim. App., delivered January 20, 1993).

habeas corpus, brought pursuant to Article 11.071 of the Texas Code of Criminal Procedure,[2] in September of 1996. He filed a supplement to his initial writ application in July of 2001. Inexplicably, the writ application did not make its way up to this Court until March of 2007. In December of 2007, we filed and set his initial writ application in order to address two contentions: 1) whether his trial counsel provided ineffective assistance of counsel at the punishment phase of his trial in failing to adequately investigate mitigating evidence; and 2) whether the trial court erred in attempting to satisfy the Eighth Amendment dictates of *Penry v. Lynaugh*,[3] by submitting a so-called jury nullification instruction.

## FACTS

### Guilt Phase

On July 19, 1988, Houston police officer Elston Howard was in the process of arresting the clerk of an adult bookstore when the applicant entered the establishment with the intention of committing robbery. Howard was wearing a jacket with the words "Houston Police" emblazoned on the front and back. The applicant shot Howard a total of four times in the back and head, three of which shots were sufficient to cause death, and then proceeded to rob the store clerk. The applicant was later apprehended, gave a written statement in which he admitted killing Howard in the course of a robbery (but denied knowing Howard had been a police officer), and eventually directed investigators to the murder weapon.

---

[2] TEX. CODE CRIM. PROC. art. 11.071.

[3] 492 U.S. 302 (1989).

## Punishment Phase

At the punishment phase of trial, in satisfaction of its burden of proof to show a probability that the applicant "would commit criminal acts of violence that would constitute a continuing threat to society,"[4] the State presented evidence of his criminal history. At the age of fourteen, the applicant was declared a delinquent and placed on probation. Less than two years later his probation was revoked, and he was committed to the custody of the Texas Youth Council. By the time he was seventeen, he had been convicted of aggravated robbery and sentenced to five years in the penitentiary. In 1978, at the age of twenty, he was convicted of two more aggravated robberies and a burglary and assessed concurrent thirty-year sentences. While in the penitentiary, the applicant committed thirteen disciplinary violations. Within two months of his release from the penitentiary in 1988, he began a spree of at least six more aggravated robberies at restaurants, nightclubs, and adult bookstores and cinemas. This crime spree culminated in Officer Howard's murder.

The defense called jail chaplain George Burrell. Burrell testified that he had met the applicant in the county jail shortly after the applicant was arrested for Howard's murder and had visited him two or three days a week since. He knew of no disciplinary violations that the applicant had committed while in the jail. In the brief time that Burrell had known the applicant, the applicant's demeanor had evolved from untalkative and disconnected to

---

[4]

*See* former TEX. CODE CRIM. PROC. art. 37.071, § b(2) (now § b(1)) ("whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society[.]").

"revived" and "bright." The applicant had even begun to counsel other inmates. Burrell had come across others during his jail ministry whom he regarded as "incorrigible," but did not count the applicant among them.

## INEFFECTIVE ASSISTANCE OF COUNSEL

### The Law

There are two components to any Sixth Amendment claim of ineffective assistance of counsel.

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense.[5]

To show prejudice, the defendant must demonstrate that, but for his counsel's deficiency, there is a reasonable probability of a different result.[6] "A reasonable probability is a probability sufficient to undermine confidence in the outcome."[7] A reviewing court need not "address both components of the inquiry if the defendant makes an insufficient showing on one."[8]

The applicant alleges that his trial attorneys performed deficiently in failing to conduct

---

[5] *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

[6] *Id*. at 694.

[7] *Id*.

[8] *Id*. at 697.

an adequate mitigation investigation, and that, had they investigated, they would have discovered significant mitigating evidence that could have been introduced at the punishment phase of his trial. With respect to counsel's duty to investigate, the Supreme Court has observed that:

> counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.[9]

Moreover, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitation on investigation."[10]

These principles do "not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing."[11] But they do require counsel to pursue any reasonably available line of mitigating evidence that preliminary investigation suggests may have promise.[12] And, because

---

[9] *Id*. at 691.

[10] *Id*. at 690-91.

[11] *Wiggins v. Smith*, 539 U.S. 510, 533 (2003).

[12] *See id*. at 527 ("In assessing the reasonableness of an attorney's investigation, . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further.").

trial counsel also have a duty to investigate what they reasonably know to be likely *aggravating* evidence against their client, a claim of ineffective assistance of counsel may also be predicated upon the failure of counsel to discover significant mitigating evidence that would have come to light, however incidentally, had they satisfied their duty to adequately investigate all reasonably anticipated aggravating circumstances.[13]

The applicant claims that, had his trial attorneys examined the district clerk's file in one of his prior aggravated-robbery cases, they would have discovered a psychological evaluation that would have led them to evidence of brain damage. He also claims that his trial attorneys were aware of other significant mitigating aspects of his life and background and should have investigated those with a view toward producing evidence at the punishment phase of his trial. We hold that, while his trial counsel may well have performed deficiently in these respects, the applicant has failed to establish a reasonable probability that, but for these deficiencies, the outcome of his punishment proceeding would have been different.

### The Facts: Brain Damage?

Prior to his prosecutions for aggravated robbery in 1978, the applicant underwent a court-ordered evaluation for sanity and competency to stand trial. Along the way to finding the applicant both sane and competent to stand trial, Dr. J. M. Bloom, a psychologist, observed:

> Although the results of psychological assessment techniques suggests [sic] the presence of mild mentally [sic] retardation and mild organic brain dysfunction, it is the [sic] opinion that these are not severe enough to produce

---

[13] *Rompilla v. Beard*, 545 U.S. 374 (2005).

the kind of deficits which [the applicant] manifested during interview. It is felt that he is attempting to present himself as a mentally ill person in order to delay proceedings.

Applicant's trial attorneys have acknowledged via affidavit that they were unaware of this report because they made no attempt to review the case files in the district clerk's office with respect to any of the applicant's prior convictions. This failure, they admit, was not the result of any particular strategy. Because of their failure to review the district clerk's files, they were "not aware of Dr. Bloom's report at the time of [the applicant's] capital murder trial." Had they been aware of the report, they "would have requested further psychological evaluation to confirm, and more fully develop, the prior diagnosis of mental retardation and organic brain dysfunction." Had that investigation panned out, they would have "argued to the jury that his diminished mental capacity made him less morally culpable for his conduct and constituted a reason to spare his life."

In an effort to meet the prejudice component of the applicant's ineffective assistance claim, habeas counsel conducted the additional psychological evaluation that he contends trial counsel should have done. A Quantified Electroencephalogram revealed dysfunction in the frontal and temporal areas of the applicant's brain. A SPECT study demonstrated the presence of frontal and left temporal lobe impairment. "These abnormal findings support the contention that the [applicant's] brain has been injured." A neuropsychological examination did *not* confirm mental retardation, but the results were "consistent with temporal and associative pathway problems." From these test results, Dr. Windel L. Dickerson, another psychologist,

concluded that "it is clear that [the applicant's] capacity for emotional control and self-inhibition is less than that of an unimpaired person and this condition has a demonstrable physical basis." "These kinds of findings are often linked," according to Dr. Dickerson, "to learning problems of a fairly subtle sort, difficulties with emotional stability and difficulty with impulsive behavior." Moreover, "[t]hese findings could have been developed" at the time of the applicant's trial "had anyone undertaken to seek them out."

In response to the applicant's claim, the State has presented a report from a forensic psychiatrist, Dr. Victor R. Scarano. Dr. Scarano challenged the diagnostic power of a Quantitative EEG to determine brain injury and asserted that a SPECT scan conducted in 1996 would reveal little about the condition of the applicant's brain at the time of the offense in 1988. Dr. Scarano concluded that these tests "do not provide any evidence that [the applicant] suffered from mental retardation, a learning disability, impulse control problems, brain damage, or organic brain dysfunction on or before" the date of the offense. He also gleaned from his review of the police offense reports that the applicant first shot Officer Howard in the back, and then, after an interval, shot him twice more in the head, execution style. Given this scenario, Dr. Scarano concluded that the applicant's killing of Howard was not, in any event, an impulsive act.

## The Facts: Disadvantaged Background?

After the State rested its case at the punishment phase of trial, the applicant's trial counsel moved the court to allow the applicant to testify to his disadvantaged background

without being subjected to open-ended cross-examination. He proffered:

> that if [the applicant] was sworn to testify, under oath he would testify that he was raised by a single parent in an impoverished home, impoverished community, by a mother who was addicted to drugs and who was as recent[ly] as 1988 . . . arrested for drug charges at the time he was arrested for this particular offense; that he completed the Ninth Grade and was a poor student in school and whereas he had no learning difficulties, had a very difficult time in – uh – making the grade in school and participating in school and learning what was being taught there.

The trial court denied the motion, and the applicant did not testify. Trial counsel called no other witness who could have testified to these or any other mitigating factors.

The applicant now faults his trial counsel for failing to introduce evidence of his disadvantaged background from other witnesses. He contends that both his mother and his sister could have supplied the same information that he was denied the opportunity to provide in the absence of open-ended cross-examination. Lead trial counsel's affidavit asserts that he interviewed both the applicant and his mother and learned that the applicant "was the product of a disadvantaged background, was raised by a drug-addicted mother, had a limited education, and abused alcohol." But he also admitted that, at the time of the applicant's capital murder trial, in 1989:

> I did not fully appreciate the concept of "mitigating evidence" as it related to the special issues submitted at the punishment stage. As a result, the defense did not conduct a "mitigation investigation" in an effort to discover evidence which could be offered at the punishment stage in support of a sentence less than death.

Both the applicant's mother and his younger sister provided affidavits to habeas counsel substantiating the applicant's disadvantaged background and asserting that trial counsel did not

talk to them "much" about it before trial and failed to ask them to testify, which they would

have been willing to do.[14] The applicant has not identified any *other* mitigation witnesses that

---

14

The applicant's younger sister, Carla Jennings, gave an affidavit that said:

My name is Carla Jennings. I am 34 years old. Robert Mitchell Jennings is my brother.

Our mother, Flora Jennings, became pregnant at age 16 and gave birth to Robert at age 17. She often told him over the years that he was conceived as a result of a "date rape," that he was the reason that she was unable to complete her education, and that she did not want him.

Mother, who lived in Houston, sent Robert to live with her mother and grandmother on a farm in Timpson because she did not want him and could not support him. In 1962, mother got married. A couple of years later, Robert was sent to Houston to live with mother, her husband, and me.

During our childhood, we had little male supervision. Father was seldom at home, and they divorced after several years. During the week, mother lived with and cared for an elderly woman. She left Robert and me at our apartment, supervised only by an older cousin. Mother came home only on the weekends. She used drugs on a regular basis.

We were poor. We usually had the barest of essentials, such as food and clothing. We had little adult supervision or love.

Robert had two head injuries requiring medical treatment during his childhood. Once, he was in an auto accident in which the car rolled over several times. On another occasion, I understand that he was hit in the head with a baseball bat.

Robert dropped out of school in junior high. He had been in special education classes, was doing poorly, and became involved with drugs. From about age 15, he was in and out of reform school and prison. He had no stable influence to guide him when he was at home.

In July of 1988, Robert was arrested and charged with capital murder. Although his lawyers talked to mother and me a couple of times, they did not ask us much about Robert's background, nor did they ask us to testify. We would have testified to the information contained in this affidavit if asked to do so.

his trial counsel may have uncovered to testify to the applicant's disadvantaged background had they conducted a full-blown mitigation investigation.

In 2003, the applicant's lead trial counsel executed a second affidavit, which is attached to the State's response. In it, he averred that he had made a strategic decision not to call both the applicant's mother and his sister as witnesses at the punishment phase of trial. He did not think the applicant's mother was "very sympathetic" to him. He did not think his sister would be a beneficial witness; apparently he believed that she did not have occasion to know very much about the applicant because he had been incarcerated in juvenile or adult correctional facilities for much of her lifetime.

**Analysis**

It is clear from trial counsel's proffer at the punishment phase of trial that, notwithstanding the claim in his initial affidavit that he did not "fully appreciate the concept" of mitigating evidence in 1989, he had some understanding of the importance of offering evidence of a disadvantaged background at the punishment phase of a capital case. Nevertheless, he has asserted in his later affidavit that his decision not to call the applicant's mother and sister was a strategic one. Was that strategic decision informed by adequate investigation? Lead trial counsel gleaned the information contained in his trial proffer from his interviews with the applicant and his mother. According to the applicant's sister, trial counsel also spoke with her. He must have been aware that they could have testified *at least*

---

The affidavit of the applicant's mother, Flora Jennings, is almost identical to Carla's.

to the poverty and lack of supervision in the applicant's single-parent home, to his mother's drug abuse, and to the applicant's difficulties in school. Whether or not trial counsel were aware of all of the particulars that have now been brought out (*viz*: that the applicant was an unwanted child with little supervision and no male role model in his life who began to abuse drugs and alcohol at an early age)[15] is of no consequence. The applicant has not shown by a preponderance of the evidence that trial counsel did not know enough of what his mother and sister could tell the jury to make an informed strategic decision not to call them. We cannot say that trial counsel's performance was deficient in this respect.

It is possible that trial counsel's admitted ignorance of the importance of conducting a full-blown mitigation investigation deprived the applicant of *other* witnesses who could and would have testified to the full extent of his disadvantaged background. But because the applicant now identifies no such witnesses, he has failed to prove by a preponderance of the evidence that such witnesses exist or would have been willing to testify at his trial. He has therefore failed to establish that he suffered any prejudice on this account.

Whether the applicant's trial attorneys were deficient in failing to make any attempt to review the State's file is a closer question. Because evidence of prior convictions and the particulars of the underlying misconduct are routinely admitted as relevant to the future-dangerousness special issue, trial counsel had a duty to review any readily available sources of information with respect to those priors. Dr. Bloom's report was publicly available in the

---

[15]

*See* note 12, *ante*.

district clerk's file. Even if Dr. Bloom himself attributed the applicant's test results to malingering, it is arguable that his report should nevertheless have sufficed to alert competent trial counsel that further psychological evaluation would be appropriate.[16] Ultimately, however, we need not determine whether the applicant's trial counsel were deficient in failing (albeit by serendipity, as in *Rompilla*) to discover this avenue of mitigating evidence. In our view, even had the applicant presented his newly developed evidence of brain damage, there is no reasonable probability that the applicant's jury would have relied upon it to recommend a sentence less than death.

In assessing prejudice, a reviewing court must evaluate the totality of mitigating evidence, both that adduced at trial and that adduced during the course of the habeas proceedings.[17] Even if we assume that trial counsel were ineffective for failing to develop the evidence of brain damage that habeas counsel has produced, there is very little mitigating evidence from trial to combine it with in deciding whether the jury would have assessed a different verdict at the punishment phase. That the jail chaplain did not consider the applicant to be incorrigible and did not know of any trouble the applicant had gotten into during his incarceration for this offense has negligible mitigating significance beyond its obvious

---

[16]

Moreover, from their interviews with the applicant's mother and sister, if not the applicant himself, trial counsel would or should have known about the significant head injuries the applicant suffered growing up. *See* note 12, *ante*. Knowledge of such injuries ought ordinarily to suggest to trial counsel the need for a psychological evaluation for debilitating brain damage.

[17]

*Ex parte Gonzales*, 204 S.W.3d 391, 398 (Tex. Crim. App. 2006); *Wiggins v. Smith*, *supra*, at 536; *Williams v. Taylor*, 529 U.S. 362, 397-98 (2000).

relevance to the future-dangerousness special issue. The question boils down, therefore, to whether there is a reasonable probability that the applicant's jury would have answered any of the statutory special issues, or would have answered a properly formulated *Penry* instruction, in such a way that the applicant would have received a life sentence instead of the death penalty.

The most evident mitigating significance of any damage to the applicant's frontal and temporal lobes is its debilitating effect upon his impulse control. The relevance to the former first special punishment issue ("whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that . . . death . . . would result") is manifest.[18] A brain-damaged defendant with diminished impulse control is less likely to have acted deliberately than a person with normal self-control.[19] The State challenges the reliability of the applicant's evidence of impaired impulse control, however, citing Dr. Scarano's affidavit. The State also argues that the evidence shows that the applicant acted in such a deliberate manner to cause Howard's death that there is no reasonable probability the jury would have been influenced by evidence of the applicant's impaired impulse control in answering the "deliberateness" special issue. Without passing upon the

---

[18]

    *See* former TEX. CODE CRIM. PROC. art. 37.071, § b(1).

[19]

    We have judicially construed "deliberately" to mean something more than just intent, *viz*: "a conscious decision involving a thought process which embraces more than mere will to engage in the conduct." *Martinez v. State*, 867 S.W.2d 30, 36-7 (Tex. Crim. App. 1993). The applicant's jury was instructed accordingly at the punishment phase.

reliability of the applicant's evidence, we agree with the State that it would not in any event have influenced the jury's decision with respect to deliberateness.

Three witnesses who were present in the bookstore when Howard was shot testified at the guilt phase of trial, including the clerk. According to those witnesses, Howard was standing at the counter of the bookstore filling out paperwork to effectuate the clerk's arrest when the applicant entered the front door about ten to twelve feet away. The applicant approached Howard "fast," according to the clerk. When Howard noticed the applicant, he "kind of froze" and said something like, "Oh, no," or "Stop." There were two shots, after which Howard "struggled" past the applicant toward the door. Before he could get out the door, however, Howard collapsed face-down, moaning. The applicant took several long strides toward Howard, and then pointed his gun down at Howard's head, firing twice more. In all, Howard suffered four gunshot wounds: two to his upper back and shoulder area and two to the head. Both of the back wounds and one of the head wounds would by themselves have proven fatal, according to the medical examiner. The interval between the first two shots and the last two shots was, by best estimates, at least "two to three seconds." Howard never had a chance to draw his weapon, which was found still holstered.

There was obviously nothing impulsive about the applicant's decision to rob the clerk of the bookstore, coming as it did at the end of a robbery spree that even included one incident earlier that same evening. But the applicant had never shot anyone before and apparently chose the establishments he would rob with a view toward minimizing any potential for

collateral damage. It is possible that a jury would find that the applicant was surprised when he unexpectedly encountered a police officer and fired the first two shots without reflection, on impulse. But we do not think there is a reasonable probability that a jury would fail to find that the *second* two shots were deliberate—that is to say, that they were the product of "more than mere will to engage in the conduct."[20] However impulsive it may have been for the applicant to shoot Howard at the outset, his conduct in striding the ten to twelve feet to where Howard subsequently collapsed and targeting his head seems to be an unmistakably deliberate act of murder.

It is possible that the applicant's jury could have regarded whatever impaired impulse control they might have found him to suffer from on account of possible brain damage to have mitigating significance beyond its tendency to negate the deliberateness special issue. Even a concededly deliberate act might be perpetrated more readily by an actor with such brain damage, the jury might reasonably believe, than by a normal person. A rational juror might even believe that an individual growing up with frontal and/or temporal lobe damage has endured a generally more disadvantaged life than one who suffered no such disability. On these bases, a jury exercising its normative function to decide whether mitigating circumstances warrant the imposition of a life sentence on a death-eligible defendant could reasonably enter the fact of the applicant's brain damage and consequent diminished impulse control on the "life" side of the ledger. But in the instant case, the applicant's brain damage

---

[20] *Id.*

would constitute practically the *only* circumstance to be entered on the side of life; there is precious little other evidence of mitigating value to counteract the substantial, non-statutory aggravating circumstances in this case.[21] We conclude that there is not a reasonable probability—a probability sufficient to undermine confidence—that the applicant's jury, taking Chaplain Burrell's meager testimony at trial together with the evidence developed during the habeas corpus proceedings of the applicant's possible brain damage and consequent lack of impulse control, would have found sufficient mitigating facts to warrant the imposition of a life sentence.[22]

### *PENRY* ERROR?

The Supreme Court's first *Penry* opinion was issued between the time that the applicant's jury was selected and the time that it was sworn in at the inception of the guilt phase of his trial.[23] The applicant's trial counsel requested that the trial court submit an

---

[21]

*See Martinez v. Quarterman*, 481 F.3d 249, 258 (5th Cir. 2007), *cert. denied*, 128 S.Ct. 1072 (2008) (reviewing court's job in assessing prejudice from failure to conduct adequate mitigation investigation is to determine whether there is a reasonable probability a jury would find that the balance of aggravating and mitigating considerations did not warrant death); *Ex parte Gonzales*, *supra*, at 398 (reviewing court evaluates "the evidence in aggravation and the available mitigating evidence, in order to determine how a jury might reasonably answer the mitigation special issue").

[22]

*E.g.*, *Martinez v. Quarterman*, *supra*; *Sonnier v. Quarterman*, 476 F.3d 349, 358-60 (5th Cir.), *cert. denied*, 128 S.Ct. 374 (2007); *Keith v. Mitchell*, 455 F.3d 662, 670 (6th Cir. 2006), *cert. denied*, 127 S.Ct. 1881 (2007). *See also Woodford v. Visciotti*, 357 U.S. 19, 25-27 (2002) (California state-court judgment that trial counsel's deficiency in failing to discover evidence of brain damage and family dysfunction was not prejudicial could not be said to be objectively unreasonable for purposes of the Antiterrorism and Effective Death Penalty Act).

[23]

*Penry v. Lynaugh*, 492 U.S. 302 (1989). Voir dire concluded on June 12, 1989. The Supreme

instruction to the jury that would have authorized it to give effect to his mitigating evidence by answering one of the statutory special issues in such a way that a life sentence would be imposed—a jury nullification instruction.[24] The trial court granted the applicant's request and instructed the jury accordingly. Of course, the Supreme Court later held that such an instruction would not suffice to cure the Eighth Amendment problem.[25] We need not decide whether the applicant waived or invited any *Penry* error by requesting the nullification instruction.[26] We conclude that the jury could give full and meaningful mitigating effect to the evidence that the applicant introduced at the punishment phase of his trial within the scope of the statutory special issues. Under these circumstances, there is no Eighth Amendment

---

Court issued its opinion in *Penry* two weeks later, on June 26th, and the guilt phase of trial commenced on July 5th.

[24]

  Trial counsel's proposed instruction read:

> When you deliberate about the questions posed in the Special Issues, you are to consider mitigating . . . circumstances and factors, if any, supported by the evidence presented in both phases of trial. A mitigating circumstance may be any aspect of the Defendant's character and record or circumstances of the crime which you believe makes a sentence of death inappropriate in this case. If you find that there are any mitigating circumstances, you must decide how much weight they deserve and give them effect when you answer the Special Issues. If you determine that, in consideration of this evidence, that a life sentence rather than a death sentence, is an appropriate response to the personal moral culpability of the Defendant, you are instructed to answer the Special Issue under consideration "No."

[25]

  *Penry v. Johnson*, 532 U.S. 782 (2001).

[26]

  *See Ex parte Moreno*, 245 S.W.3d 419, 430-31 & n.42 (Tex. Crim. App. 2008) (request for jury nullification instruction was sufficient to alert trial court to *Penry* problem and thus preserve error; the applicant did not "invite" *Penry* error by requesting a flawed curative instruction—at least not when trial court did not *grant* the applicant's request).

deficiency.

The applicant's *Penry* claim is limited to the evidence actually adduced at his trial, and does not include the jury's ability to render a reasoned moral response to mitigating evidence he now claims *should* have been adduced.[27] The only mitigating evidence presented at trial was Chaplain Burrell's testimony with respect to the applicant's behavior and demeanor in the jail. Apart from its ameliorating relevance with respect to the future-dangerousness special issue, however, this evidence had, at best, only the most "tenuous connection . . . to the defendant's moral culpability."[28] That being the case, the Eighth Amendment does not require a new punishment proceeding.[29]

Relief is denied.

Delivered:     November 26, 2008
Do Not Publish

---

[27]

*See Ex parte Kunkle*, 852 S.W.2d 499, 504 (Tex. Crim. App. 1993) ("we shall not consider mitigating evidence not presented or proffered at trial in determining the merits of" a *Penry* claim); *Miniel v. Cockrell*, 339 F.3d 331, 338 (5th Cir. 2003) (*Penry* claim cannot be predicated on evidence not presented at trial).

[28]

*See Abdul-Kabir v. Quarterman*, 550 U.S. 233, 127 S.Ct. 1654, 1668 n.14 (2007) ("special instruction is not required when mitigating evidence has only a tenuous connection –'*some* arguable relevance'–to the defendant's moral culpability.").

[29]

*Smith v. Quarterman*, 515 F.3d 392, 414 (5th Cir. 2008) (testimony that petitioner was "calm and respectful," "non-violent," and "not a drug-user" had only "tenuous connection" to his moral culpability, and therefore did not require special mitigation instruction under the Eighth Amendment, consistent with *Abdul-Kabir*). *See also Franklin v. Lynaugh*, 487 U.S. 164, 177-78 (1988) (plurality opinion) (future-dangerousness special issue sufficient to accommodate "any mitigating impulse that petitioner's prison record might have suggested to the jury as they proceeded with their task").