IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NOS. AP-75,806 & 75,807






EX PARTE ROBERT MITCHELL JENNINGS, Applicant








ON APPLICATION FOR A WRIT OF HABEAS CORPUS


IN CAUSE NO. 506814-A FROM THE


208TH DISTRICT COURT OF HARRIS COUNTY






 Price, J., delivered the opinion of the Court in which Meyers, Womack,
Keasler, Hervey and Cochran, JJ., joined. Keller, P.J., and Johnson, J.,
concurred in the result. Holcomb, J., dissented.


O P I N I O N



 In 1989, the applicant was convicted of capital murder and his punishment was
assessed, in accordance with the jury's answers to the special issues at the punishment phase
of trial, at death. On direct appeal, this Court affirmed his conviction and sentence in an
unpublished opinion issued in 1993. (1) The applicant filed this initial application for writ of
habeas corpus, brought pursuant to Article 11.071 of the Texas Code of Criminal Procedure, (2)
in September of 1996. He filed a supplement to his initial writ application in July of 2001. 
Inexplicably, the writ application did not make its way up to this Court until March of 2007. 
In December of 2007, we filed and set his initial writ application in order to address two
contentions: 1) whether his trial counsel provided ineffective assistance of counsel at the
punishment phase of his trial in failing to adequately investigate mitigating evidence; and 2)
whether the trial court erred in attempting to satisfy the Eighth Amendment dictates of Penry
v. Lynaugh, (3) by submitting a so-called jury nullification instruction.

FACTS

Guilt Phase

 On July 19, 1988, Houston police officer Elston Howard was in the process of arresting
the clerk of an adult bookstore when the applicant entered the establishment with the intention
of committing robbery. Howard was wearing a jacket with the words "Houston Police"
emblazoned on the front and back. The applicant shot Howard a total of four times in the back
and head, three of which shots were sufficient to cause death, and then proceeded to rob the
store clerk. The applicant was later apprehended, gave a written statement in which he
admitted killing Howard in the course of a robbery (but denied knowing Howard had been a
police officer), and eventually directed investigators to the murder weapon.

Punishment Phase

 At the punishment phase of trial, in satisfaction of its burden of proof to show a
probability that the applicant "would commit criminal acts of violence that would constitute
a continuing threat to society," (4) the State presented evidence of his criminal history. At the age
of fourteen, the applicant was declared a delinquent and placed on probation. Less than two
years later his probation was revoked, and he was committed to the custody of the Texas Youth
Council. By the time he was seventeen, he had been convicted of aggravated robbery and
sentenced to five years in the penitentiary. In 1978, at the age of twenty, he was convicted of
two more aggravated robberies and a burglary and assessed concurrent thirty-year sentences. 
While in the penitentiary, the applicant committed thirteen disciplinary violations. Within two
months of his release from the penitentiary in 1988, he began a spree of at least six more
aggravated robberies at restaurants, nightclubs, and adult bookstores and cinemas. This crime
spree culminated in Officer Howard's murder. 

 The defense called jail chaplain George Burrell. Burrell testified that he had met the
applicant in the county jail shortly after the applicant was arrested for Howard's murder and
had visited him two or three days a week since. He knew of no disciplinary violations that the
applicant had committed while in the jail. In the brief time that Burrell had known the
applicant, the applicant's demeanor had evolved from untalkative and disconnected to
"revived" and "bright." The applicant had even begun to counsel other inmates. Burrell had
come across others during his jail ministry whom he regarded as "incorrigible," but did not
count the applicant among them.

INEFFECTIVE ASSISTANCE OF COUNSEL

The Law

 There are two components to any Sixth Amendment claim of ineffective assistance of
counsel.

 First, the defendant must show that counsel's performance was deficient. This
requires showing that counsel made errors so serious that counsel was not
functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. 
Second, the defendant must show that the deficient performance prejudiced the
defense. (5)


To show prejudice, the defendant must demonstrate that, but for his counsel's deficiency, there
is a reasonable probability of a different result. (6) "A reasonable probability is a probability
sufficient to undermine confidence in the outcome." (7) A reviewing court need not "address
both components of the inquiry if the defendant makes an insufficient showing on one." (8)

 The applicant alleges that his trial attorneys performed deficiently in failing to conduct
an adequate mitigation investigation, and that, had they investigated, they would have
discovered significant mitigating evidence that could have been introduced at the punishment
phase of his trial. With respect to counsel's duty to investigate, the Supreme Court has
observed that:

 counsel has a duty to make reasonable investigations or to make a reasonable
decision that makes particular investigations unnecessary. In any ineffectiveness
case, a particular decision not to investigate must be directly assessed for
reasonableness in all the circumstances, applying a heavy measure of deference
to counsel's judgments. (9)


Moreover, "strategic choices made after less than complete investigation are reasonable
precisely to the extent that reasonable professional judgments support the limitation on
investigation." (10)

 These principles do "not require counsel to investigate every conceivable line of
mitigating evidence no matter how unlikely the effort would be to assist the defendant at
sentencing." (11) But they do require counsel to pursue any reasonably available line of
mitigating evidence that preliminary investigation suggests may have promise. (12) And, because
trial counsel also have a duty to investigate what they reasonably know to be likely
aggravating evidence against their client, a claim of ineffective assistance of counsel may also
be predicated upon the failure of counsel to discover significant mitigating evidence that would
have come to light, however incidentally, had they satisfied their duty to adequately investigate
all reasonably anticipated aggravating circumstances. (13)

 The applicant claims that, had his trial attorneys examined the district clerk's file in one
of his prior aggravated-robbery cases, they would have discovered a psychological evaluation
that would have led them to evidence of brain damage. He also claims that his trial attorneys
were aware of other significant mitigating aspects of his life and background and should have
investigated those with a view toward producing evidence at the punishment phase of his trial. 
We hold that, while his trial counsel may well have performed deficiently in these respects, the
applicant has failed to establish a reasonable probability that, but for these deficiencies, the
outcome of his punishment proceeding would have been different.

The Facts: Brain Damage?

 Prior to his prosecutions for aggravated robbery in 1978, the applicant underwent a
court-ordered evaluation for sanity and competency to stand trial. Along the way to finding
the applicant both sane and competent to stand trial, Dr. J. M. Bloom, a psychologist, observed:

 Although the results of psychological assessment techniques suggests
[sic] the presence of mild mentally [sic] retardation and mild organic brain
dysfunction, it is the [sic] opinion that these are not severe enough to produce
the kind of deficits which [the applicant] manifested during interview. It is felt
that he is attempting to present himself as a mentally ill person in order to delay
proceedings.


Applicant's trial attorneys have acknowledged via affidavit that they were unaware of this
report because they made no attempt to review the case files in the district clerk's office with
respect to any of the applicant's prior convictions. This failure, they admit, was not the result
of any particular strategy. Because of their failure to review the district clerk's files, they were
"not aware of Dr. Bloom's report at the time of [the applicant's] capital murder trial." Had
they been aware of the report, they "would have requested further psychological evaluation to
confirm, and more fully develop, the prior diagnosis of mental retardation and organic brain
dysfunction." Had that investigation panned out, they would have "argued to the jury that his
diminished mental capacity made him less morally culpable for his conduct and constituted a
reason to spare his life."

 In an effort to meet the prejudice component of the applicant's ineffective assistance
claim, habeas counsel conducted the additional psychological evaluation that he contends trial
counsel should have done. A Quantified Electroencephalogram revealed dysfunction in the
frontal and temporal areas of the applicant's brain. A SPECT study demonstrated the presence
of frontal and left temporal lobe impairment. "These abnormal findings support the contention
that the [applicant's] brain has been injured." A neuropsychological examination did not
confirm mental retardation, but the results were "consistent with temporal and associative
pathway problems." From these test results, Dr. Windel L. Dickerson, another psychologist,
concluded that "it is clear that [the applicant's] capacity for emotional control and self-inhibition is less than that of an unimpaired person and this condition has a demonstrable
physical basis." "These kinds of findings are often linked," according to Dr. Dickerson, "to
learning problems of a fairly subtle sort, difficulties with emotional stability and difficulty with
impulsive behavior." Moreover, "[t]hese findings could have been developed" at the time of
the applicant's trial "had anyone undertaken to seek them out."

 In response to the applicant's claim, the State has presented a report from a forensic
psychiatrist, Dr. Victor R. Scarano. Dr. Scarano challenged the diagnostic power of a
Quantitative EEG to determine brain injury and asserted that a SPECT scan conducted in 1996
would reveal little about the condition of the applicant's brain at the time of the offense in
1988. Dr. Scarano concluded that these tests "do not provide any evidence that [the applicant]
suffered from mental retardation, a learning disability, impulse control problems, brain damage,
or organic brain dysfunction on or before" the date of the offense. He also gleaned from his
review of the police offense reports that the applicant first shot Officer Howard in the back,
and then, after an interval, shot him twice more in the head, execution style. Given this
scenario, Dr. Scarano concluded that the applicant's killing of Howard was not, in any event,
an impulsive act.

The Facts: Disadvantaged Background?

 After the State rested its case at the punishment phase of trial, the applicant's trial
counsel moved the court to allow the applicant to testify to his disadvantaged background
without being subjected to open-ended cross-examination. He proffered:

 that if [the applicant] was sworn to testify, under oath he would testify that he
was raised by a single parent in an impoverished home, impoverished
community, by a mother who was addicted to drugs and who was as recent[ly]
as 1988 . . . arrested for drug charges at the time he was arrested for this
particular offense; that he completed the Ninth Grade and was a poor student in
school and whereas he had no learning difficulties, had a very difficult time in
- uh - making the grade in school and participating in school and learning what
was being taught there.


The trial court denied the motion, and the applicant did not testify. Trial counsel called no
other witness who could have testified to these or any other mitigating factors.

 The applicant now faults his trial counsel for failing to introduce evidence of his
disadvantaged background from other witnesses. He contends that both his mother and his
sister could have supplied the same information that he was denied the opportunity to provide
in the absence of open-ended cross-examination. Lead trial counsel's affidavit asserts that he
interviewed both the applicant and his mother and learned that the applicant "was the product
of a disadvantaged background, was raised by a drug-addicted mother, had a limited education,
and abused alcohol." But he also admitted that, at the time of the applicant's capital murder
trial, in 1989:

 I did not fully appreciate the concept of "mitigating evidence" as it related to the
special issues submitted at the punishment stage. As a result, the defense did not
conduct a "mitigation investigation" in an effort to discover evidence which
could be offered at the punishment stage in support of a sentence less than death.


Both the applicant's mother and his younger sister provided affidavits to habeas counsel
substantiating the applicant's disadvantaged background and asserting that trial counsel did not
talk to them "much" about it before trial and failed to ask them to testify, which they would
have been willing to do. (14) The applicant has not identified any other mitigation witnesses that
his trial counsel may have uncovered to testify to the applicant's disadvantaged background
had they conducted a full-blown mitigation investigation.

 In 2003, the applicant's lead trial counsel executed a second affidavit, which is attached
to the State's response. In it, he averred that he had made a strategic decision not to call both
the applicant's mother and his sister as witnesses at the punishment phase of trial. He did not
think the applicant's mother was "very sympathetic" to him. He did not think his sister would
be a beneficial witness; apparently he believed that she did not have occasion to know very
much about the applicant because he had been incarcerated in juvenile or adult correctional
facilities for much of her lifetime.

Analysis

 It is clear from trial counsel's proffer at the punishment phase of trial that,
notwithstanding the claim in his initial affidavit that he did not "fully appreciate the concept"
of mitigating evidence in 1989, he had some understanding of the importance of offering
evidence of a disadvantaged background at the punishment phase of a capital case. 
Nevertheless, he has asserted in his later affidavit that his decision not to call the applicant's
mother and sister was a strategic one. Was that strategic decision informed by adequate
investigation? Lead trial counsel gleaned the information contained in his trial proffer from
his interviews with the applicant and his mother. According to the applicant's sister, trial
counsel also spoke with her. He must have been aware that they could have testified at least
to the poverty and lack of supervision in the applicant's single-parent home, to his mother's
drug abuse, and to the applicant's difficulties in school. Whether or not trial counsel were
aware of all of the particulars that have now been brought out (viz: that the applicant was an
unwanted child with little supervision and no male role model in his life who began to abuse
drugs and alcohol at an early age) (15) is of no consequence. The applicant has not shown by a
preponderance of the evidence that trial counsel did not know enough of what his mother and
sister could tell the jury to make an informed strategic decision not to call them. We cannot
say that trial counsel's performance was deficient in this respect.

 It is possible that trial counsel's admitted ignorance of the importance of conducting a
full-blown mitigation investigation deprived the applicant of other witnesses who could and
would have testified to the full extent of his disadvantaged background. But because the
applicant now identifies no such witnesses, he has failed to prove by a preponderance of the
evidence that such witnesses exist or would have been willing to testify at his trial. He has
therefore failed to establish that he suffered any prejudice on this account.

 Whether the applicant's trial attorneys were deficient in failing to make any attempt to
review the State's file is a closer question. Because evidence of prior convictions and the
particulars of the underlying misconduct are routinely admitted as relevant to the future-dangerousness special issue, trial counsel had a duty to review any readily available sources
of information with respect to those priors. Dr. Bloom's report was publicly available in the
district clerk's file. Even if Dr. Bloom himself attributed the applicant's test results to
malingering, it is arguable that his report should nevertheless have sufficed to alert competent
trial counsel that further psychological evaluation would be appropriate. (16) Ultimately,
however, we need not determine whether the applicant's trial counsel were deficient in failing
(albeit by serendipity, as in Rompilla) to discover this avenue of mitigating evidence. In our
view, even had the applicant presented his newly developed evidence of brain damage, there
is no reasonable probability that the applicant's jury would have relied upon it to recommend
a sentence less than death.

 In assessing prejudice, a reviewing court must evaluate the totality of mitigating
evidence, both that adduced at trial and that adduced during the course of the habeas
proceedings. (17) Even if we assume that trial counsel were ineffective for failing to develop the
evidence of brain damage that habeas counsel has produced, there is very little mitigating
evidence from trial to combine it with in deciding whether the jury would have assessed a
different verdict at the punishment phase. That the jail chaplain did not consider the applicant
to be incorrigible and did not know of any trouble the applicant had gotten into during his
incarceration for this offense has negligible mitigating significance beyond its obvious
relevance to the future-dangerousness special issue. The question boils down, therefore, to
whether there is a reasonable probability that the applicant's jury would have answered any of
the statutory special issues, or would have answered a properly formulated Penry instruction,
in such a way that the applicant would have received a life sentence instead of the death
penalty.

 The most evident mitigating significance of any damage to the applicant's frontal and
temporal lobes is its debilitating effect upon his impulse control. The relevance to the former
first special punishment issue ("whether the conduct of the defendant that caused the death of
the deceased was committed deliberately and with the reasonable expectation that . . . death
. . . would result") is manifest. (18) A brain-damaged defendant with diminished impulse control
is less likely to have acted deliberately than a person with normal self-control. (19) The State
challenges the reliability of the applicant's evidence of impaired impulse control, however,
citing Dr. Scarano's affidavit. The State also argues that the evidence shows that the applicant
acted in such a deliberate manner to cause Howard's death that there is no reasonable
probability the jury would have been influenced by evidence of the applicant's impaired
impulse control in answering the "deliberateness" special issue. Without passing upon the
reliability of the applicant's evidence, we agree with the State that it would not in any event
have influenced the jury's decision with respect to deliberateness.

 Three witnesses who were present in the bookstore when Howard was shot testified at
the guilt phase of trial, including the clerk. According to those witnesses, Howard was
standing at the counter of the bookstore filling out paperwork to effectuate the clerk's arrest
when the applicant entered the front door about ten to twelve feet away. The applicant
approached Howard "fast," according to the clerk. When Howard noticed the applicant, he
"kind of froze" and said something like, "Oh, no," or "Stop." There were two shots, after
which Howard "struggled" past the applicant toward the door. Before he could get out the
door, however, Howard collapsed face-down, moaning. The applicant took several long strides
toward Howard, and then pointed his gun down at Howard's head, firing twice more. In all,
Howard suffered four gunshot wounds: two to his upper back and shoulder area and two to the
head. Both of the back wounds and one of the head wounds would by themselves have proven
fatal, according to the medical examiner. The interval between the first two shots and the last
two shots was, by best estimates, at least "two to three seconds." Howard never had a chance
to draw his weapon, which was found still holstered.

 There was obviously nothing impulsive about the applicant's decision to rob the clerk
of the bookstore, coming as it did at the end of a robbery spree that even included one incident
earlier that same evening. But the applicant had never shot anyone before and apparently
chose the establishments he would rob with a view toward minimizing any potential for
collateral damage. It is possible that a jury would find that the applicant was surprised when
he unexpectedly encountered a police officer and fired the first two shots without reflection,
on impulse. But we do not think there is a reasonable probability that a jury would fail to find
that the second two shots were deliberate--that is to say, that they were the product of "more
than mere will to engage in the conduct." (20) However impulsive it may have been for the
applicant to shoot Howard at the outset, his conduct in striding the ten to twelve feet to where
Howard subsequently collapsed and targeting his head seems to be an unmistakably deliberate
act of murder.

 It is possible that the applicant's jury could have regarded whatever impaired impulse
control they might have found him to suffer from on account of possible brain damage to have
mitigating significance beyond its tendency to negate the deliberateness special issue. Even
a concededly deliberate act might be perpetrated more readily by an actor with such brain
damage, the jury might reasonably believe, than by a normal person. A rational juror might
even believe that an individual growing up with frontal and/or temporal lobe damage has
endured a generally more disadvantaged life than one who suffered no such disability. On
these bases, a jury exercising its normative function to decide whether mitigating
circumstances warrant the imposition of a life sentence on a death-eligible defendant could
reasonably enter the fact of the applicant's brain damage and consequent diminished impulse
control on the "life" side of the ledger. But in the instant case, the applicant's brain damage
would constitute practically the only circumstance to be entered on the side of life; there is
precious little other evidence of mitigating value to counteract the substantial, non-statutory
aggravating circumstances in this case. (21) We conclude that there is not a reasonable
probability--a probability sufficient to undermine confidence--that the applicant's jury, taking
Chaplain Burrell's meager testimony at trial together with the evidence developed during the
habeas corpus proceedings of the applicant's possible brain damage and consequent lack of
impulse control, would have found sufficient mitigating facts to warrant the imposition of a life
sentence. (22)

PENRY ERROR?

 The Supreme Court's first Penry opinion was issued between the time that the
applicant's jury was selected and the time that it was sworn in at the inception of the guilt
phase of his trial. (23) The applicant's trial counsel requested that the trial court submit an
instruction to the jury that would have authorized it to give effect to his mitigating evidence
by answering one of the statutory special issues in such a way that a life sentence would be
imposed--a jury nullification instruction. (24) The trial court granted the applicant's request and
instructed the jury accordingly. Of course, the Supreme Court later held that such an
instruction would not suffice to cure the Eighth Amendment problem. (25) We need not decide
whether the applicant waived or invited any Penry error by requesting the nullification
instruction. (26) We conclude that the jury could give full and meaningful mitigating effect to the
evidence that the applicant introduced at the punishment phase of his trial within the scope of
the statutory special issues. Under these circumstances, there is no Eighth Amendment
deficiency.

 The applicant's Penry claim is limited to the evidence actually adduced at his trial, and
does not include the jury's ability to render a reasoned moral response to mitigating evidence
he now claims should have been adduced. (27) The only mitigating evidence presented at trial
was Chaplain Burrell's testimony with respect to the applicant's behavior and demeanor in the
jail. Apart from its ameliorating relevance with respect to the future-dangerousness special
issue, however, this evidence had, at best, only the most "tenuous connection . . . to the
defendant's moral culpability." (28) That being the case, the Eighth Amendment does not require
a new punishment proceeding. (29)

 Relief is denied.

Delivered: November 26, 2008

Do Not Publish
1. Jennings v. State, No. 70,911 (Tex. Crim. App., delivered January 20, 1993).
2. Tex. Code Crim. Proc. art. 11.071.
3. 492 U.S. 302 (1989).
4. See former Tex. Code Crim. Proc. art. 37.071, § b(2) (now § b(1)) ("whether there is a
probability that the defendant would commit criminal acts of violence that would constitute a
continuing threat to society[.]").
5. Strickland v. Washington, 466 U.S. 668, 687 (1984).
6. Id. at 694.
7. Id.
8. Id. at 697.
9. Id. at 691.
10. Id. at 690-91.
11. Wiggins v. Smith, 539 U.S. 510, 533 (2003).
12. See id. at 527 ("In assessing the reasonableness of an attorney's investigation, . . . a court must
consider not only the quantum of evidence already known to counsel, but also whether the known
evidence would lead a reasonable attorney to investigate further.").
13. Rompilla v. Beard, 545 U.S. 374 (2005).
14. The applicant's younger sister, Carla Jennings, gave an affidavit that said:


 My name is Carla Jennings. I am 34 years old. Robert Mitchell Jennings is my
brother.


 Our mother, Flora Jennings, became pregnant at age 16 and gave birth to
Robert at age 17. She often told him over the years that he was conceived as a result
of a "date rape," that he was the reason that she was unable to complete her education,
and that she did not want him.


 Mother, who lived in Houston, sent Robert to live with her mother and
grandmother on a farm in Timpson because she did not want him and could not
support him. In 1962, mother got married. A couple of years later, Robert was sent
to Houston to live with mother, her husband, and me.


 During our childhood, we had little male supervision. Father was seldom at
home, and they divorced after several years. During the week, mother lived with and
cared for an elderly woman. She left Robert and me at our apartment, supervised only
by an older cousin. Mother came home only on the weekends. She used drugs on a
regular basis.


 We were poor. We usually had the barest of essentials, such as food and
clothing. We had little adult supervision or love.


 Robert had two head injuries requiring medical treatment during his childhood. 
Once, he was in an auto accident in which the car rolled over several times. On
another occasion, I understand that he was hit in the head with a baseball bat.


 Robert dropped out of school in junior high. He had been in special education
classes, was doing poorly, and became involved with drugs. From about age 15, he
was in and out of reform school and prison. He had no stable influence to guide him
when he was at home.


 In July of 1988, Robert was arrested and charged with capital murder. 
Although his lawyers talked to mother and me a couple of times, they did not ask us
much about Robert's background, nor did they ask us to testify. We would have
testified to the information contained in this affidavit if asked to do so.


The affidavit of the applicant's mother, Flora Jennings, is almost identical to Carla's. 
15. See note 12, ante.
16. Moreover, from their interviews with the applicant's mother and sister, if not the applicant
himself, trial counsel would or should have known about the significant head injuries the applicant
suffered growing up. See note 12, ante. Knowledge of such injuries ought ordinarily to suggest to trial
counsel the need for a psychological evaluation for debilitating brain damage.
17. Ex parte Gonzales, 204 S.W.3d 391, 398 (Tex. Crim. App. 2006); Wiggins v. Smith, supra,
at 536; Williams v. Taylor, 529 U.S. 362, 397-98 (2000).
18. See former Tex. Code Crim. Proc. art. 37.071, § b(1).
19. We have judicially construed "deliberately" to mean something more than just intent, viz: "a
conscious decision involving a thought process which embraces more than mere will to engage in the
conduct." Martinez v. State, 867 S.W.2d 30, 36-7 (Tex. Crim. App. 1993). The applicant's jury was
instructed accordingly at the punishment phase.
20. Id.
21. See Martinez v. Quarterman, 481 F.3d 249, 258 (5th Cir. 2007), cert. denied, 128 S.Ct. 1072
(2008) (reviewing court's job in assessing prejudice from failure to conduct adequate mitigation
investigation is to determine whether there is a reasonable probability a jury would find that the
balance of aggravating and mitigating considerations did not warrant death); Ex parte Gonzales, supra,
at 398 (reviewing court evaluates "the evidence in aggravation and the available mitigating evidence,
in order to determine how a jury might reasonably answer the mitigation special issue").
22. E.g., Martinez v. Quarterman, supra; Sonnier v. Quarterman, 476 F.3d 349, 358-60 (5th Cir.),
cert. denied, 128 S.Ct. 374 (2007); Keith v. Mitchell, 455 F.3d 662, 670 (6th Cir. 2006), cert. denied,
127 S.Ct. 1881 (2007). See also Woodford v. Visciotti, 357 U.S. 19, 25-27 (2002) (California state-court judgment that trial counsel's deficiency in failing to discover evidence of brain damage and
family dysfunction was not prejudicial could not be said to be objectively unreasonable for purposes
of the Antiterrorism and Effective Death Penalty Act).
23. Penry v. Lynaugh, 492 U.S. 302 (1989). Voir dire concluded on June 12, 1989. The Supreme
Court issued its opinion in Penry two weeks later, on June 26th, and the guilt phase of trial commenced
on July 5th.
24. Trial counsel's proposed instruction read:


 When you deliberate about the questions posed in the Special Issues, you are
to consider mitigating . . . circumstances and factors, if any, supported by the evidence
presented in both phases of trial. A mitigating circumstance may be any aspect of the
Defendant's character and record or circumstances of the crime which you believe
makes a sentence of death inappropriate in this case. If you find that there are any
mitigating circumstances, you must decide how much weight they deserve and give
them effect when you answer the Special Issues. If you determine that, in
consideration of this evidence, that a life sentence rather than a death sentence, is an
appropriate response to the personal moral culpability of the Defendant, you are
instructed to answer the Special Issue under consideration "No."
25. Penry v. Johnson, 532 U.S. 782 (2001).
26. See Ex parte Moreno, 245 S.W.3d 419, 430-31 & n.42 (Tex. Crim. App. 2008) (request for
jury nullification instruction was sufficient to alert trial court to Penry problem and thus preserve error;
the applicant did not "invite" Penry error by requesting a flawed curative instruction--at least not
when trial court did not grant the applicant's request).
27. See Ex parte Kunkle, 852 S.W.2d 499, 504 (Tex. Crim. App. 1993) ("we shall not consider
mitigating evidence not presented or proffered at trial in determining the merits of" a Penry claim); 
Miniel v. Cockrell, 339 F.3d 331, 338 (5th Cir. 2003) (Penry claim cannot be predicated on evidence
not presented at trial).
28. See Abdul-Kabir v. Quarterman, 550 U.S. 233, 127 S.Ct. 1654, 1668 n.14 (2007) ("special
instruction is not required when mitigating evidence has only a tenuous connection -'some arguable
relevance'-to the defendant's moral culpability.").
29. Smith v. Quarterman, 515 F.3d 392, 414 (5th Cir. 2008) (testimony that petitioner was "calm
and respectful," "non-violent," and "not a drug-user" had only "tenuous connection" to his moral
culpability, and therefore did not require special mitigation instruction under the Eighth Amendment,
consistent with Abdul-Kabir). See also Franklin v. Lynaugh, 487 U.S. 164, 177-78 (1988) (plurality
opinion) (future-dangerousness special issue sufficient to accommodate "any mitigating impulse that
petitioner's prison record might have suggested to the jury as they proceeded with their task").